GARCIA RAINEY BLANK & BOWERBANK LLP
A LIMITED LIABILITY PARTNERSHIP
NORMA V. GARCIA, Cal. Bar No. 223512
ngarciaguillen@garciarainey.com
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
695 Town Center Drive, Suite 540
Costa Mesa, CA 92626
Telephone:   (714) 382-7000
Facsimile:   (714) 784-0031

Attorneys for Plaintiff
Michael

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| HOWARD WU<br><br>    Debtor, | **Case No.: 2:21-bk-19480-ER**<br>Chapter 7<br><br>**Adv. Proceeding No.: 2:22-ap-01071-ER** |
| MICHAEL CHUNG-HOU CHIANG, an individual; and AGNES SHENE HWA CHIN, an individual<br><br>    Plaintiffs,<br>  vs.<br>HOWARD WU, an Individual<br><br>    Defendant | **SECOND AMENDED ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. §§ 523(a)(2)(A) AND (a)(6)** |

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST HOWARD WU

Plaintiffs Michael Chung-Hou Chiang ("Mr. Chiang") and Agnes Shene Hwa Chin ("Ms. Chin") (together, "Plaintiffs") complain and allege as follows against Defendant Howard Wu ("WU" or "Defendant") as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1334, 157, and 11. U.S.C. § 523. This is a core proceeding pursuant to 28 U.S.C. § 157.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409 in that the instant proceeding is related to the Defendant's bankruptcy case which is still pending in this District.

3.      This adversary proceeding is commenced pursuant to Rule 7001(6) of the Federal Rules of Bankruptcy Procedure, 11 U.S.C. §§ 523(a)(2) and (a)(6), and any other applicable section of the Bankruptcy Code or any other Rule of the Federal Rules of Bankruptcy Procedure.

## THE PARTIES

4.      On December 29, 2021 (the "Petition Date") Defendant Howard Wu filed for Chapter 7 Bankruptcy in this District. The bankruptcy action is entitled *In re Howard Chorng Jeng Wu*, Case No. 2:21-bk-19480-ER.

5.      Plaintiff Michael Chung-Hou Chiang is an individual residing in Los Angeles, California.

6.      Plaintiff Agnes Shene Hwa Chin is an individual residing in Temple City, California.

7.      Plaintiffs are informed and believe that Defendant Howard Wu (hereinafter, "WU"), is an individual residing in the State of California, County of Los Angeles and conducting business in the State of California, County of Los Angeles.

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST HOWARD WU

## GENERAL ALLEGATIONS

**UC Crenshaw**

8.      On or about April 9, 2019, Mr. Chiang invested Three Hundred and Sixty Thousand Dollars ($360,000.00) in UC CRENSHAW. UC CRENSHAW is the single purpose limited liability company through which Defendant and his cohorts were going to purchase the real property formerly known as 1027 Crenshaw Blvd., Los Angeles, California 90019. Attached hereto as **Exhibit A** is a true and correct copy of Mr. Chiang's Membership Interest Subscription Agreement ("UC Crenshaw Subscription Agreement") for UC CRENSHAW.

9.      Mr. Chiang also executed an Operating Agreement ("UC Crenshaw Operating Agreement") as part of his $360,000.00 investment in UC CRENSHAW. Paragraph 1.14 of the UC Crenshaw Operating Agreement defines a "Capital Event" as the sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from involuntary conversion of Property, the receipt of proceeds from a refinancing of Property, or a similar event with respect to Property or assets. Paragraph 1.51 defines "Property" to mean that certain property known as 1027 Crenshaw Blvd., Los Angeles, CA, and any other tangible or intangible, real, or personal property contributed to or acquired or owned directly or indirectly by the Company. Attached hereto as **Exhibit B** is a true and correct copy of the UC Crenshaw Operating Agreement.

10.      Paragraph 4.12 of the UC Crenshaw Operating Agreement further states that all revenues or proceeds from a Capital Event or the dissolution of the Company shall be distributed among the Members.

11.      Plaintiffs are informed and believe and, on that basis, allege that on or about May 31, 2019, Defendant closed escrow on the Property. Plaintiffs are informed and believe and, on that basis, allege that unbeknownst to all investors in UC CRENSHAW, including Mr. Chiang, on or about September 17, 2020, Defendant and his cohorts secretly sold the Property to 1009 Crenshaw LP for Twenty-Eight Million Dollars ($28,000,000). This is apparent in the change of title paperwork by Western Resources Title.

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST HOWARD WU

12.     Plaintiffs are informed and believe and, on that basis, allege that Defendant and his associates kept the entirety of the $28,000,000 sale proceeds for themselves even though the sale of the Property constituted a "Capital Event" under Paragraph 1.14 of the UC Crenshaw Operating Agreement which required Defendant and his associates to distribute the proceeds from the $28,000,000 sale amongst the UC CRENSHAW investors, including Mr. Chiang.

13.     On or about March 8, 2021, during a Zoom meeting with investors Defendants represented to the UC CRENSHAW investors, including Mr. Chiang, that the development plans for the Property were ongoing including the drawing of architectural designs and zoning plans. Plaintiffs are informed and believe and, on that basis, allege that at the time these representations were made by Defendants, Defendants knew these representations to be false and made said representations with the intent to deceive the UC CRENSHAW investors, including Mr. Chiang, as at the time these representations were made on March 8, 2021, Defendants no longer owned the Property as a result of the sale to 1009 Crenshaw LP back on September 17, 2020.

14.     Plaintiffs are informed and believe and, on that basis, allege that at the time Defendant misrepresented to the UC CRENSHAW investors, including Mr. Chiang, that UC CRENSHAW still owned the Property, Defendant did so in order to defraud the UC CRENSHAW investors, including Mr. Chiang, out of the $28,000,000 sale proceeds the UC CRENSHAW investors, including Mr. Chiang, were entitled to under the UC Crenshaw Operating Agreement.

15.     Plaintiffs are informed and believe and, on that basis, further allege that at the time Defendant misrepresented to the UC CRENSHAW investors, including Mr. Chiang, that UC CRENSHAW still owned the Property, Defendant and his cohorts did so with the intent to keep the proceeds from the $28,000,000 sale for himself and in order to avoid returning to the UC CRENSHAW investors, including Mr. Chiang, their investment sums.

**UC Seattle**

16.     In or about January 2020, Defendant by and through Urban Commons, LLC

- 4 -

("URBAN COMMONS"), a privately held real estate investment trust (REIT) management company, issued a private offering ("UC Seattle Offering") to investors seeking to raise Thirty Million Dollars ($30,000,000) in membership interest in Urban Commons 6th Ave Seattle, LLC ("UC SEATTLE"). UC SEATTLE is the single purpose limited liability company through which Defendant was going to purchase the real property known as Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington ("Hilton Seattle"). A true and correct copy of the Membership Interest Subscription Agreement ("Subscription Agreement") for Plaintiffs Mr. Chiang and Ms. Chin are attached hereto as **Exhibits C and D**, respectively.

17.     As part of the UC Seattle Offering, Plaintiffs were provided with the following documents: (i) Letter of Intent to Purchase Hilton Seattle, (ii) Hilton Seattle Purchase and Sale Agreement, and (iii) the Subscription Agreement for UC SEATTLE. Based on the representations set forth in the Subscription Agreement, including but not limited to: (i) the purchase price for the Hilton Seattle will be deposited into an interest-bearing secure bank account, (ii) all interest earned on such account will be used by UC SEATTLE to pay all costs and expenses (including, but not limited to, all legal, accounting and management costs and expenses) incurred in connection with this offering and the formation of UC Seattle, (iii) UC SEATTLE would obtain an acquisition loan in an approximate aggregate amount of approximately Seventy Million Dollars ($70,000,000.00) in order to acquire and refurbish the Hilton Seattle, (iv) in the event the subscription was terminated, the funds raised by UC SEATTLE would be returned to the investors, Plaintiffs each invested One Hundred and Fifty Thousand Dollars ($150,000) in UC SEATTLE for a total investment sum of Three Hundred Thousand Dollars ($300,000.)

18.     As part of their investment in UC SEATTLE, Plaintiffs each executed a Subscription Agreement and on July 10, 2020, Plaintiffs wired $300,000 to UC SEATTLE. Attached hereto as **Exhibit E** is a true and correct copy of the Wire Transfer receipt.

19.     The UC Seattle Subscription Agreement expressly stated that "the Company (UC Seattle) will not use or apply the purchase price until the Company has raised the

- 5 -

1     necessary funds from this offering. The funds raised for the offerings will be used to invest

2     in an entity which shall acquire, own, operate, and eventually sell that certain property

3     known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington (the

4     "Property.")

5         20.     The UC Seattle Subscription Agreement further stated that: "(i) the purchase

6     price will be deposited into an interest-bearing secure bank account and (ii) all interest

7     earned on such account will be used by the Company to pay all costs and expenses

8     (including, but not limited to, all legal, accounting and management costs and expenses)

9     incurred in connection with this offering and the formation of the Company."

10         21.     The UC Seattle Subscription Agreement also stated that in the event the

11     subscription were terminated, "all funds raised by the Company will be returned to the

12     applicable investors, together with any interest remaining on such funds following the

13     payment of all costs and expenses."

14         22.     The UC Seattle Subscription Agreement further stated that the Company

15     would be obtaining acquisition loans in an approximate aggregate amount of approximately

16     Seventy Million Dollars ($70,000,000.00) in order to acquire and refurbish the Property.

17         23.     Plaintiffs are informed and believe and therefore allege that to date,

18     Defendant and his associates have not completed their offering for UC SEATTLE nor have

19     Defendants raised the Thirty Million Dollars ($30,000,000) from the offering of

20     membership interests in UC SEATTLE.

21         24.     Plaintiffs are informed and believe and therefore allege that to date,

22     Defendant and his associates have not obtained a financing commitment for the acquisition

23     loans in an approximate aggregate amount of Seventy Million Dollars ($70,000,000.00) in

24     order to acquire and refurbish the Hilton Seattle.

25         25.     Plaintiffs are informed and believe and therefore allege that to date,

26     Defendant and his associates have not acquired or refurbished the Hilton Seattle.

27         26.     In addition to executing the Subscription Agreement, Plaintiffs each also

28     entered into an Investment Agreement with Defendant and his associates. The terms of the

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST
HOWARD WU

1    Investment Agreement stated that "Member shall receive a six percent (6%) guaranteed

2    preferred return per annum on Investment Capital ("Preferred Return"), to be paid each

3    Calendar Quarter at the rate of 1.5% each Calendar Quarter. "Preferred Return" means an

4    amount calculated like interest and accrued on the balance standing from time to time in

5    such Member's Investment Capital account at a simple interest rate equal to six percent

6    (6%) per annum, non-compounded. "Calendar Quarter" shall mean each period of three (3)

7    consecutive calendar months commencing on the first day of January, April, July, and

8    October of each Calendar Year.

9        27.    The Investment Agreement further stated, "Net profits of Company that

10   exceed 6% per annum will be distributed to the members of the Company on a pro rata basis

11   in accordance to the percentage of ownership interest as set forth in Exhibit A of the

12   Operating Agreement." Plaintiffs allege that to date; they have only received one (1)

13   Preferred Return payment each.

14       28.    During the marketing and solicitation of investments in the membership

15   interest of UC SEATTLE, Defendant did not disclose his relationship with, involvement in,

16   and/or ownership interest in EAGLEHT, which is the Singaporean REIT which was

17   supposed to buy UC SEATTLE upon UC SEATTLE's acquisition of the Hilton Seattle.

18   Plaintiffs are informed and believe and therefore allege that Defendant owns and/or owned

19   17% of the equity in EAGLEHT and was and/or is Chairman and Deputy Chairman,

20   respectively of the EAGLEHT board.

21       29.    Plaintiffs are informed and believe and therefore allege that at the time

22   Defendant issued the offering of membership interests in UC SEATTLE to Plaintiffs,

23   Defendant knew EAGLEHT was not performing well and failed to disclose this material

24   fact to Plaintiffs. Specifically, Defendant knew that EAGLEHT had defaulted on a Three

25   Hundred and Forty-One Million Dollar (US $341,000,000.00) facility loan. Importantly,

26   this default occurred in or about December 2019.

27       30.    Plaintiffs are informed and believe and therefore allege that at the time

28   Defendant issued the offering of membership interests in UC SEATTLE to Plaintiffs,

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST
HOWARD WU

Defendant knew that trading of EAGLEHT SP was suspended. Notably, EAGLEHT SP is the name under which shares of EAGLEHT were sold on the Singapore Stock Exchange. Plaintiffs are also informed and believe and therefore allege that Defendant holds and/or held shares of EAGLEHT SP as a result of his relationship, involvement and/or ownership interest in EAGLEHT.

31.    Further, Plaintiffs are informed and believe and therefore allege that at the time Defendant issued the offering of membership interests in UC SEATTLE, Defendant knew he and his associates were under investigation by the Monetary Authority of Singapore (MAS) and the Singapore Exchange for suspected breaches of disclosure requirements under Section 203 of the Singapore Securities and Futures Act, and breaches of regulations and listing rules in relation to EAGLEHT SP.

32.    Notably, nowhere in the documents provided to Plaintiffs as part of the UC Seattle Offering, including the Subscription Agreement and the Investment Agreement, did Defendant disclose his involvement with, connection to, and/or relationship with EAGLEHT. Nor did Defendant disclose in the documents provided to Plaintiffs as part of the UC Seattle Offering the financial trouble EAGLEHT was under, including failure to disclose that EAGLEHT had defaulted in its a Three Hundred and Forty-One Million Dollar (US $341,000,000.00) facility loan in or about December 2019. Nor did the UC Seattle Offering documents provided to Plaintiffs disclose anything about EAGLEHT SP's troubles with the Monetary Authority of Singapore (MAS) and the Singapore Exchange and suspension of EAGLEHT SP's shares on the Singapore Exchange. Indeed, none of the aforementioned disclosures were made to Plaintiffs prior to them investing in UC SEATTLE even though Defendant had an obligation to do so.

33.    Defendant made misrepresentations of material facts and omitted material facts concerning the offering of the membership interests in UC SEATTLE. Plaintiffs relied on such misrepresentations in deciding to invest in UC SEATTLE. But for such misrepresentations and material omissions, Plaintiffs would not have invested a cumulative sum of $300,000 in UC SEATTLE.

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST
HOWARD WU

34. In sum, in the pitch to solicit the purchase of membership interests in UC SEATTLE by Plaintiffs, Defendant, by means of written and oral communications, made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading, including, inter alia:

    a. Materially misrepresented and omitted material facts concerning their credentials, experience, expertise, and capabilities in order to induce the trust and confidence of Plaintiffs and other investors and lenders;

    b. Failed to disclose the default by EAGLEHT and acceleration thereafter of its Three Hundred and Forty-One Million Dollar (US$341,000,000.00) loan;

    c. Materially misrepresented and omitted material facts concerning the completion dates for the offerings and the dates on which the Seattle Hilton would be sold to EAGLEHT;

    d. Materially misrepresented and omitted material facts concerning raising the necessary funds from the offering of membership interests in order to purchase the Seattle Hilton;

    e. Materially misrepresented and omitted material facts concerning the status of the investment, acquisition of the Seattle Hilton, and escrow account allegedly holding Plaintiffs' investment; and

    f. Materially misrepresented and omitted material facts concerning the Preferred Returns Plaintiffs would receive under the Investment Agreement

35. On or about June 19, 2021, WU told Plaintiffs that he would find another investor to take over their shares in Hilton Seattle and repay Plaintiffs their $300,000 investment in UC SEATTLE.

36. On information and belief, and on that basis, Plaintiffs allege that WU used new investor funds to pay off "interest" to existing investors, including Plaintiffs, and in some cases buyout investors who questioned his business practices, instead of using new investor funds for the actual promised investment. This conduct is the classic representation

of a Ponzi scheme.

## Wu is An Alter Ego of UC Seattle

37.   Plaintiffs are informed and believe that Defendant has so blatantly disregarded the corporate formalities between himself and UC Seattle that allowing him to seek protection from his fraudulent conduct by hiding behind UC Seattle would result in an injustice against this court and Plaintiffs. Plaintiffs are informed and believes that Defendant disregarded the corporate formalities by:

    a.   Transferring at least $1,940,000 from UC Seattle to Urban Commons, LLC, a limited liability entity he controlled along with his partner Taylor Woods, in 2020 despite a specific prohibition against transfers included in the UC Seattle Offering Documents as alleged in ¶ 17 above.

    b.   Subsequently transferring $513,500 of the aforementioned funds to his personally controlled accounts in 2020, despite failing to remit Plaintiff's Preferred Return Payments as alleged in ¶ 27 above and despite UC Seattle's failure to acquire the Property as alleged in ¶ 25 above.

    c.   Treating UC Seattle assets and funds as his own.

    d.   Taking funds from UC Seattle and transferring them to his other controlled Urban Common entities, in addition to his own personal use.

38.   Plaintiff is informed and believes that Defendant was one of two member managers of Urban Commons, LLC, the limited liability entity that was contractually appointed as the manager of the Property by the UC Seattle Offering Documents. Plaintiff is further informed and believes that Defendant used his position as member manager of Urban Commons, LLC and his position in UC Seattle to fraudulently transfer funds between UC Seattle, Urban Commons, LLC and his personal accounts as alleged above.

39.   Further, Wu has already been declared a "fraudster" by another United States Bankruptcy Court Judge from the District of Delaware in *In re EHT US1, Inc.* 633 B.R. 223.

    a.   In his opinion, Bankruptcy Court Judge for the District of Delaware Judge

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST HOWARD WU

Christopher S. Sontchi stated:

> "Messrs. Woods and Wu are fraudsters. They fraudulently obtained a PPP loan on behalf of the Debtor without authority and absconded with the proceeds, leaving either the Debtor or the United States to pay back the lender. They were sued by the Debtor, and, after notice and a hearing, the Court entered summary judgment against them and their company and enjoined Defendants from dissipating their assets. In addition, the Court ordered a detailed accounting. Defendants have not provided a sufficient accounting and have baldly stated they intend to dissipate their assets." *Id* at 225

## FIRST CLAIM FOR RELIEF

### (For Non-Dischargeability of Debt For False Pretenses, False Representation and/or Actual Fraud under 11 U.S.C. § 532(a)(2)(A) As To Plaintiffs' Investments in UC Seattle Against Defendant WU)

40. Plaintiffs hereby incorporate each and every allegation contained in paragraphs 1 through 39 and reallege those allegations as if fully set forth herein.

41. Defendant incurred obligations to Plaintiffs by false pretenses, false representations, and/or actual fraud.

42. Defendant misrepresented essential material facts. As part of the UC Seattle Offering, Defendant promised that: (i) UC SEATTLE would not use or apply the purchase price until the necessary funds from the offering had been raised; (ii) the funds raised for UC Seattle Offering would be used to invest in UC SEATTLE which would acquire, own, operate, and eventually sell the Seattle Hilton; (iii) the purchase price for the Hilton Seattle would be deposited into interest-bearing secure bank accounts; (iv) if the Subscription Agreement was terminated, all funds raised would be returned to the investors, together with any interest remaining on such funds following the payment of all costs and expenses; (v) UC SEATTLE would obtain a loan in an approximate aggregate amount of $70 million to acquire the Seattle Hilton; and (vi) the Seattle Hilton would be sold to EAGLEHT.

43. At the time Defendant made this representation, Defendant knew that such representations were false, as Defendant were well aware that: (i) EAGLEHT was not

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST HOWARD WU

1   performing well, (ii) EAGLEHT had defaulted on a $341 million facility loan, (iii) the

2   default dated back to December 2019, (iv) Defendant and his associates were under

3   investigation by the Monetary Authority of Singapore ("MAS") and the Singapore

4   Exchange for suspected breaches of disclosure requirements under Section 203 of the

5   Singapore Securities and Futures Act, and breaches of regulations and listing rules in

6   relation to EAGLEHT SP; and (v) trading of EAGLEHT SP's units had been suspended.

7       44.     Defendant made such representations to induce Plaintiffs into investing in UC

8   SEATTLE.

9       45.     In reliance on such representations, Plaintiffs invested in UC SEATTLE.

10      46.     Plaintiffs were harmed by Defendant's concealment in that had important

11  facts been disclosed, Plaintiffs would have taken steps, including not investing in UC

12  SEATTLE pursuant to the UC Seattle Offering.

13      47.     The intentionally fraudulent acts of Defendant were undertaken in a malicious

14  manner justifying an award of punitive damages against Defendant and in favor of Plaintiff.

15      48.     Based on the facts alleged herein, Plaintiffs request that Defendant's

16  obligations to Plaintiffs be found non-dischargeable in their entirety pursuant to 11 U.S.C.

17  § 523(a)(2)(A) as the debts owed to Plaintiffs were obtained by false pretense, false

18  representation and/or actual fraud.

19                          **SECOND CLAIM FOR RELIEF**

20  **(For Non-Discharegability Based on Willful and Malicious Injury Under 11 U.S.C. §**

21      **523(a)(6) As To Plaintiffs' Investments in UC Seattle Against Defendant WU)**

22      49.     Plaintiffs hereby incorporate each and every allegation contained in

23  paragraphs 1 through 48 and reallege those allegations as if fully set forth herein.

24      50.     Defendant, by making representations to Plaintiffs, inflicted willful and

25  malicious injury to Plaintiffs. Among other things, Defendant knew that such

26  representations were false, as Defendant were well aware that: (i) EAGLEHT was not

27  performing well, (ii) EAGLEHT had defaulted on a $341 million facility loan, (iii) the

28  default dated back to December 2019, (iv) Defendant and his associates were under

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST
HOWARD WU

1  investigation by the Monetary Authority of Singapore ("MAS") and the Singapore

2  Exchange for suspected breaches of disclosure requirements under Section 203 of the

3  Singapore Securities and Futures Act, and breaches of regulations and listing rules in

4  relation to EAGLEHT SP; and (v) trading of EAGLEHT SP's units had been suspended.

5       51.    Defendant misrepresented essential material facts. As part of the UC Seattle

6  Offering, Defendant promised that: (i) UC SEATTLE would not use or apply the purchase

7  price until the necessary funds from the offering had been raised; (ii) the funds raised for

8  UC Seattle Offering would be used to invest in UC SEATTLE which would acquire, own,

9  operate, and eventually sell the Seattle Hilton; (iii) the purchase price for the Hilton Seattle

10 would be deposited into interest-bearing secure bank accounts; (iv) if the Subscription

11 Agreement was terminated, all funds raised would be returned to the investors, together

12 with any interest remaining on such funds following the payment of all costs and expenses;

13 (v) UC SEATTLE would obtain a loan in an approximate aggregate amount of $70 million

14 to acquire the Seattle Hilton; and (vi) the Seattle Hilton would be sold to EAGLEHT.

15      52.    Defendant's conduct was wrongful, was without just cause or excuse, and

16 necessarily caused injury to Plaintiffs.

17      53.    Plaintiffs were damaged as a result of Defendant's conduct.

18      54.    The actions of Defendant were undertaken in a malicious manner justifying

19 an award of punitive damages against Defendant and in favor of Plaintiffs.

20      55.    Based upon the facts alleged herein, Plaintiffs request that Defendant's

21 obligations to Plaintiffs be found non-dischargeable in their entirety pursuant to 11 U.S.C.

22 § 523(a)(6).

23                        **THIRD CLAIM FOR RELIEF**

24 **(For Non-Dischargeability of Debt for False Pretenses, False Representations and/or**

25 **Actual Fraud Under 11 U.S.C § 532(a)(2)(A) As To Plaintiff Chiang's Investment In**

26                **UC Crenshaw Against Defendant WU)**

27      56.    Plaintiffs hereby incorporate each and every allegation contained in

28 paragraphs 1 through 55 and reallege those allegations as if fully set forth herein.

- 13 -

57.     Defendant incurred obligations to Mr. Chiang by false pretenses, false representations, and/or actual fraud.

58.     Defendant misrepresented essential material facts. On or about March 8, 2021, Defendant misrepresented to UC CRENSHAW investors, including Mr. Chiang that UC CRENSHAW still owned the Property and that development plans for the Property were ongoing including the drawing of architectural designs and zoning plans.

59.     Plaintiffs are informed and believe, and on that basis allege, that at the time these representations were made by Defendant, Defendant knew these representations to be false and made said representations with the intent to deceive Mr. Chiang.  Indeed, at the time these representations were made on March 8, 2021, Defendants no longer owned the Property as a result of selling the Property to 1009 Crenshaw LP back on September 17, 2020.

60.     Plaintiffs are informed and believe, and on that basis allege, that at the time Defendant misrepresented to Mr. Chiang that UC CRENSHAW still owned the Property, Defendant and his cohorts did so in order to defraud Mr. Chiang out of the percentage of the proceeds from the $28,000,000 sale he was entitled to under the UC Crenshaw Operating Agreement.

61.     Plaintiffs are informed and believe, and on that basis further allege, that at the time Defendant misrepresented to Mr. Chiang that UC CRENSHAW still owned the Property, Defendant did so for Defendant to keep the proceeds from $28,000,000 sale for himself and in order to avoid returning to Mr. Chiang his $360,000 investment in UC CRENSHAW.

62.     Defendant made such representations about UC CRENSHAW still owning the Property in order to induce Mr. Chiang into keeping his $360,000 investment in UC CRENSHAW.

63.     In reliance on the representation that UC CRENSHAW still owned the Property and development plans were ongoing, Mr. Chiang kept his $360,000 investment in UC CRENSHAW.

- 14 -

64.     Mr. Chiang was harmed by Defendant's concealment in that had the important fact that UC CRENSHAW no longer owned the Property but had in fact sold it five (5) months prior to the March 8, 2021 Zoom meeting, Mr. Chiang would have immediately taken steps to recoup his $360,000 investment sum and the percentage of the proceeds from the $28,000,000 sale he was entitled to under the UC Crenshaw Operating Agreement. What Mr. Chiang would not have done is allowed Defendant to keep his full $360,000 investment.

65.     The intentionally fraudulent acts of Defendant were undertaken in a malicious manner justifying an award of punitive damages against Defendant and in favor of Mr. Chiang.

66.     Based on the facts alleged herein, Plaintiffs request that Defendant's obligations to Mr. Chiang be found non-dischargeable in their entirety pursuant to 11 U.S.C. § 523(a)(2)(A) as the debts owed to Mr. Chiang were obtained by false pretense, false representation and/or actual fraud.

## **FOURTH CLAIM FOR RELIEF**

**(For Non-Dischargeability Based on Willful and Malicious Injury Under 11 U.S.C § 523(a)(6) As To Plaintiff Chiang's Investment in UC Crenshaw Against Defendant WU)**

67.     Plaintiffs hereby incorporate each and every allegation contained in paragraphs 1 through 66 and reallege those allegations as if fully set forth herein.

68.     Defendant, by making representations to Mr. Chiang on March 8, 2021 that UC CRENSHAW still owned the Property, inflicted willful and malicious injury to him. Among other things, Defendant knew that such representations were false, as at the time Defendant represented to Mr. Chiang that UC CRENSHAW still owed the Property and that development plans were ongoing, Defendant was well aware that: (i) development plans for the Property were not ongoing as five (5) months prior, on or about September 17, 2020, UC CRENSHAW had sold the Property to Property to 1009 Crenshaw LP, (ii) the Property was sold for $28,000,000, and (iii) Defendant and his cohorts kept the proceeds

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST HOWARD WU

1    from the $28,000,000 sale for themselves.

2         69.    Defendant's conduct was wrongful, was without just cause or excuse, and

3    necessarily caused injury to Mr. Chiang.

4         70.    Mr. Chiang was damaged as a result of Defendant's conduct.

5         71.    The actions of Defendant were undertaken in a malicious manner justifying

6    an award of punitive damages against Defendant and in favor of Mr. Chiang.

7         72.    Based upon the facts alleged herein, Plaintiffs request that Defendant's

8    obligations to Mr. Chiang be found non-dischargeable in its entirety pursuant to 11 U.S.C.

9    § 523(a)(6).

10                        **PRAYER FOR RELIEF**

11        WHEREFORE, Plaintiffs Michael Chung-Ho Chiang and Agnes Shene Hwa Chin

12   ("Plaintiffs") pray for judgment against Defendant Howard Wu, as follows:

13

14        **ON THE FIRST CLAIM FOR RELIEF:**

15   1.   For judgment that the debts owed by Defendant to Plaintiffs are non

16        dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

17   2.   For judgment against Defendant in a sum of at least $336,000.00 which is

18        the investment funds of $300,000 plus 2 years of guaranteed "preferred

19        interest return" as in the Hilton Seattle Agreement, plus pre- judgment

20        interest and interest, as general and special damages to proven at trial; and

21   3.   For punitive damages.

22        **ON THE SECOND CLAIM FOR RELIEF:**

23   4.   For judgment that the debts owed by Defendant to Plaintiffs are non-

24        dischargeable pursuant to 11 U.S.C. § 523(a)(6);

25   5.   For judgment against Defendant in a sum of at least $336,000.00 which is

26        the investment funds of $300,000 plus 2 years of guaranteed "preferred

27        interest return" as in the Hilton Seattle Agreement, plus pre- judgment

28        interest and interest, as general and special damages to proven at trial; and

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST
HOWARD WU

6. For punitive damages.

**ON THE THIRD CLAIM FOR RELIEF:**

7. For judgment that the debts owed by Defendant to Mr. Chiang are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A);

8. For judgment against Defendant in a sum of at least $680,000 which is the investment funds of the Crenshaw Project $360,000, plus the sales profit, plus pre- judgment interest and interest, as general and special damages to proven at trial; and

9. For punitive damages.

**ON THE FOURTH CLAIM FOR RELIEF:**

10. For judgment that the debts owed by Defendant to Mr. Chiang are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6);

11. For judgment against Defendant in a sum of at least $680,000 which is the investment funds of the Crenshaw Project, $360,000, plus the sales profit, plus pre- judgment interest and interest, as general and special damages to proven at trial; and

12. For punitive damages.

**FOR ALL CAUSES OF ACTION:**

13. For costs of suit incurred herein;

14. For reasonable attorneys' fees incurred by Plaintiffs, to the extent allowed by law; and

15. For such other and further relief as the Court may deem just and proper.

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST HOWARD WU

DATED: September 20, 2022    GARCIA RAINEY BLANK & BOWERBANK LLP


By _____

NORMA V. GARCIA
JEFFREY M. BLANK
Attorneys for Plaintiffs
Michael Chung-Hou Chiang
and Agnes Shene Hwa Chin

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST
HOWARD WU

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

DATED: September 20, 2022    GARCIA RAINEY BLANK & BOWERBANK LLP

By _____

NORMA V. GARCIA
JEFFREY M. BLANK
Attorneys for Plaintiff
Michael Chung-Hou Chiang
And Agnes Shene Hwa Chin

ADVERSARY COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT AGAINST
HOWARD WU

# EXHIBIT A

# URBAN COMMONS CRENSHAW BLVD, LLC
# MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT

TO:     Urban Commons Crenshaw Blvd, LLC

I hereby irrevocably offer to purchase a membership interest (the "Interest") in Urban Commons Crenshaw Blvd, LLC, a California limited liability company (the "Company"), for a purchase price of $ _360,000_ , upon the terms and conditions described below. The membership interest shall be calculated using my capital contribution divided by the total capital contribution of $12,000,000.00, which shall result in an ownership percentage of _3_ %. I agree to pay the balance of the purchase price for the Interest to the Company not later than April 10, 2019. I will deliver to the Company the purchase price for the Interest in the manner set forth in Section 14 below.

I understand that up to 100% of the membership qualified purchasers may purchase interests in the Company in this offering. I further understand that the Company may terminate this offering at any time, that the Company, in its discretion, may accept or reject my subscription, provided that notification of such rejection must be given to me within 15 days after this Agreement, properly completed and signed by me, and full payment of the purchase price for the Interest is delivered to the Company, and that, if there is such rejection notification, the purchase price will be promptly returned to me without interest. The Company anticipates completing this offering by April 15, 2019.

I understand the Company will not use or apply the purchase price until the Company has raised the necessary funds from this offering. The funds raised from the offerings will be used to invest in an entity that shall acquire, own, operate, and eventually sell that certain property formerly known as 1027 Crenshaw Blvd., Los Angeles, CA (the "Property"). I further understand that (i) the purchase price will be deposited into an interest-bearing secure bank account and (ii) all interest earned on such account will be used by the Company to pay all cost and expenses (including, but not limited to, all legal, accounting and management costs and expenses) incurred in connection with this offering and the formation of the Company. The initial membership interests of the members will be reflected in the Operating Agreement for the Company. If this subscription is terminated, all funds raised by the Company will be returned to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses.

I understand the Company is obtaining acquisition loans in an approximate aggregate amount of approximately $9,000,000.00 in order to acquire the Property but that the terms for such financing have not yet been finalized.

I understand that the terms of the Interest and related agreements are set forth in the Operating Agreement for the Company, a copy of which has been or will be provided separately to me. The Company's acceptance of my subscription will be conditioned on my entering into the Operating Agreement and agreeing to be bound by all of its terms. I understand that the Operating Agreement for the Company will name Urban Commons, LLC as the sole manager of the Company (the "Manager") with exclusive authority and control over all Company decisions in entering into and managing real estate investments. The Operating Agreement will provide that each investor's capital will be returned at the time of a capital event(s) and prior to any profits from such capital event(s) being distributed to the members.

I understand that the purchase of the Interest involves certain risks, including, but not limited to, the risks identified on the **Schedule of Investment Risks** attached to this Agreement. I have carefully read and considered these risks before making this offer to purchase the Interest.

In connection with my subscription for and purchase of the Interest, I hereby represent and warrant to the Company and agree as follows:

1.     I am acquiring the Interest for my own account for investment and not with a view to or for sale in connection with any distribution of the Interest.

2.     In making this investment, I am relying upon my own investigation and analysis and have determined that the Interest is a suitable investment for me. The Company has made available to me information, and the opportunity to question its representatives, concerning the terms of this offering and the proposed investment of the Company in various real investments. I have been furnished with such information as I have requested. It has never been guaranteed or warranted by the Company, or any person connected with or acting on the Company's behalf, that I will be able to sell or liquidate the Interest in any specified period of time or that there will be any particular profit to be realized as a result of this investment. I have adequate means to provide for my current and expected financial needs and reasonable contingencies, can bear the economic risks (including a complete loss of the purchase price) associated with my purchase of the Interest and have no need for liquidity in this investment.

3.     The Company has advised me that the Interest is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), in reliance upon the exemption from the registration requirements provided by Section 4(2), Rule 506 of Regulation

D and/or Regulation S under the 1933 Act, and are not being qualified or registered under any state securities laws in reliance upon applicable exemptions from the qualification and registration requirements. I understand that no federal or state agency has made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Interest. I understand that the Company is relying in part on my representations set forth in this Agreement for purposes of claiming such exemptions. I understand the Company is under no obligation to register the Interest on my behalf.

4.      I agree that I, and any transferees of the Interest, shall be bound by the restrictions on transfers of the Interest which are described in this paragraph or are otherwise applicable under federal or state securities laws. I also understand that any certificate representing the Interest will bear a legend substantially in the following form, and any legend appropriate to comply with applicable state securities laws, which I agree to abide by:

"THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS DULY QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, BASED ON AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED."

I agree that stop transfer instructions prohibiting transfers of the Interest may be filed in the Company's records or issued to the Company's transfer agent as a means of preventing the sale or disposition of the Interest in violation of the restrictions and legends set forth in this paragraph above and that any transfer of the Interest or any portion thereof causing such a violation shall be void.

5.      The offer to sell the Interest was directly communicated to me by direct communication with the Company's director(s), officer(s) or manager(s), and I was not presented with or solicited by any leaflet, public promotional meeting, television advertisement, or other form of general advertising.     (FILL IN THE FOLLOWING)     I am a citizen of
_____USA_____ or, if I am an entity, I was formed and exist under the laws of
_____.

6.      I have a substantial preexisting personal or business relationship with the Company's management personnel and/or, by reason of my business or financial experience, or the business or financial experience of my management if I am an entity, am capable of evaluating the merits and risks of my purchase of the Interest and have the capacity to protect my interests in connection with this investment.

7.      I am an "Accredited Investor," as defined in Rule 501(a) of Regulation D under the 1933 Act, as follows (CHECK EACH APPLICABLE BOX—AT LEAST ONE MUST BE APPLICABLE AND CHECKED):

[✓]     (a)     I am a natural person whose individual net worth, or joint net worth with my spouse, including the estimated net fair market value of my principal residence, presently exceeds $1,000,000; and/or

[ ]     (b)     I am a natural person who had individual income, without that of my spouse, in excess of $200,000 in each of the two most recent years and reasonably expects to have income in excess of $200,000 in the current year; and/or

[ ]     (c)     I am a natural person who had joint income with my spouse in excess of $300,000 in each of the two most recent years and reasonably expects to have such joint income in excess of $300,000 in the current year; and/or

[ ]     (d)     I am (circle which one) a corporation, partnership, limited liability company, or organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000; and/or

[ ]     (e)     I am a trust, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000 whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this prospective investment); and/or

[ ]     (f)     I am any of the following (CIRCLE WHICH ONE): a bank (as defined in Section 3(a)(2) of the 1933 Act), or a savings and loan association or other institution (as defined in Section 3(a)(5) of the 1933 Act), whether acting in an individual or fiduciary capacity; or a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; or an insurance company (as defined in Section 2(13) of the 1933 Act; or an investment company registered under the Investment Company Act of 1940; or a business development company (as defined in Section 2(a)(48) of the Investment Company Act of 1940; or a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Administration Act of 1958; or a

2

plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of such Act), which is either a bank, savings and loan association, insurance company or registered investment adviser or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; and/or

[ ]     (g)     I am an entity in which all of the equity owners are Accredited Investors.

8.     (CHECK THIS BOX IF APPLICABLE:     [ ]) The offer to sell the Interest was not made to me by the Company or its agents while I was in, and I have made this offer to buy the Interest and signed this Agreement when I have been outside of, the United States of America (which for purposes of this Agreement includes all of its states, territories and possessions and the District of Columbia).

9.     The information set forth in this Agreement is correct with respect to me as of the date of my execution of this Agreement. I will promptly notify the Company of any change in such information occurring before I am notified of the acceptance of my subscription by the Company and will provide any further supplementary information, which is requested by the Company.

10.     I hereby agree to indemnify the Company and its officers, directors, managers and agents against, and hold such parties harmless from, any and all liabilities, damages, costs or expenses, including, without limitation, those arising under federal or state securities laws, incurred on account of or arising out of: (a) any inaccuracy in my representations and covenants set forth herein; or (b) the disposition of any of portion of the Interest which I will receive, contrary to my foregoing representations and covenants.

11.     If a corporation, partnership, trust, limited liability company or other form of business entity, I am authorized and otherwise duly qualified to purchase and hold the Interest and have not been formed for the specific purpose of making an investment in the Company. If an undersigned individual is executing this Agreement, as well as all other related documents, on behalf of any entity, such individual represents that he or she is duly authorized to execute all such documents on behalf of that entity. If an individual, I am under no legal disability with respect to entering into this Agreement or purchasing the Interest.

12.     At the Company's request, I will promptly execute such other instruments or documents as may be reasonably required in connection with my purchase of the Interest. Whenever the context hereof so requires, use of either the masculine, feminine or neuter shall include the masculine, feminine and neuter, and use of the singular or the plural form shall include the singular and plural. This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of laws provisions. In any dispute or legal proceeding relating to the enforcement of rights under this Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and costs. This Agreement constitutes the entire agreement between me and the Company, and supersedes any prior or contemporaneous representations, warranties, understandings or agreements, with respect to the subject matter of this Agreement. Neither this Agreement nor any provision hereof may be amended, waived or canceled except by an instrument in writing signed by the party against whom any such amendment, waiver or cancellation is sought. Any provision of this Agreement which is invalid or unenforceable under applicable laws shall be deemed inoperative to the extent it conflicts with such laws, but shall not affect the enforceability of other provisions of this Agreement. No waiver of any of the provisions of this Agreement shall be deemed a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.

13.     This Agreement shall be binding upon my heirs, executors, administrators, successors and assigns. However, my rights and obligations to purchase the Interest under this Agreement may not be assigned or transferred to any other person without the Company's prior written consent and any assignment or transfer in violation of this paragraph shall be void.

14.     The purchase price for the Interest will be paid in the form of a (wire, check, transfer, etc): ___wire___.

3

**ADDITIONAL INFORMATION**

[COMPLETE EACH ITEM. MODIFY AS APPROPRIATE IF THERE ARE TWO OR MORE PURCHASERS. ADD ADDITIONAL SHEETS IF NECESSARY TO COMPLETE ANY OF THE ITEMS.]

1.  Give the exact name(s) in which title to the Interest is to be taken:

    Michael Chiang

Indicate the type of ownership [check one]:

[✓]  Individual ownership
     (One signature required)

[ ]  Joint Tenancy
     (Both parties must sign)

[ ]  Trust (Include
     name of trustee(s) and date
     trust was established)

[ ]  Community Property
     (Spouse or spouses named
     as record holder(s)
     must sign)

[ ]  Partnership (Include
     copy of the statement
     of partnership or the
     partnership agreement
     or certificate authorizing
     signature)

[ ]  Tenants in Common
     (Both parties must sign)

[ ]  Corporation (Include
     certified corporate
     resolution authorizing
     purchase and signature)

[ ]  Other:_____

2.  If the purchaser is other than an individual purchasing for his or her own account (a corporation, trustee, partnership, custodian, estate, etc.), indicate the nature of the purchaser and the capacity of any person(s) signing above on behalf of the purchaser.

_____

_____

3.  Residence address of purchaser or principal business address (if an entity):

4.  Mailing address (if different than residence address) to be used for notices from the Company:

5.  Telephone numbers:

    Business:       (____) _____

    Residence:

    Facsimile:      (____) _____

6.  Tax ID Number (Social Security Number if an individual):

7.  E-Mail Address:

Printed Name of Purchaser       Signature of Purchaser

_Michael Chiang_       _[signature]_

Printed Name(s) and Title(s) or       Signature(s) of Any Officer(s),
Capacity(ies) of any Officer(s)       Partner(s) or Agent(s) Acting
Partner(s) or Agent(s) Acting on       on Behalf of Purchaser if an entity:
Behalf of Purchaser (if an entity):


Name: _____       Signature: _____

Title: _____

Printed Name of Member

Signature of Member

*Michael Chiang*

*Michael C*

Printed Name(s) and Title(s) or
Capacity(ies) of any Officer(s)
Partner(s) or Agent(s) Acting on
Behalf of Member

Signature(s) of Any Officer(s),
Partner(s) or Agent(s) Acting
on Behalf of Member

By: _____

By: _____

Title: _____

**ACCEPTANCE BY THE COMPANY**

        Urban Commons Crenshaw Blvd, LLC hereby accepts the foregoing agreement and agrees to be bound by its provisions.

DATED: _04 / 09 / 19_

 

Urban Commons Crenshaw Blvd, LLC,
a Delaware limited liability company

By:    Urban Commons, LLC,
       a Delaware limited liability company,
       Its Manager

By: _____
Signature

_Patrick Gu_
Printed Name

_Authorized Signor_
Title

# EXHIBIT B

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## FOR

## URBAN COMMONS CRENSHAW BLVD, LLC

THE MEMBERSHIP INTERESTS IN URBAN COMMONS CRENSHAW BLVD, LLC HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED WITH THE CORPORATIONS OR SECURITIES COMMISSIONER OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF SUCH LAWS.  ANY ATTEMPTED TRANSFER OF THE SECURITIES IS RESTRICTED BY SUCH LAWS AS WELL AS RESTRICTIONS DESCRIBED IN THE WITHIN AGREEMENT.

Dated:  As of October 31, 2018

# TABLE OF CONTENTS

Page

ARTICLE I: DEFINITIONS .................................................................... 1

ARTICLE II: ORGANIZATION ............................................................. 6

ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS ................................. 7

ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS ........................... 9

ARTICLE V: MANAGEMENT .............................................................. 14

ARTICLE VI: ACCOUNTS AND ACCOUNTING ................................... 20

ARTICLE VII: MEMBERSHIP-MEETINGS, VOTING, INDEMNITY ........... 22

ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS .................... 23

ARTICLE IX: DISSOLUTION AND WINDING UP ................................. 27

ARTICLE X: INDEMNIFICATION AND ARBITRATION ......................... 28

ARTICLE XI: INVESTMENT REPRESENTATIONS ................................. 29

ARTICLE XII: ATTORNEY-IN-FACT AND AGENT ............................... 29

ARTICLE XIII: GENERAL PROVISIONS ............................................. 30

## LIMITED LIABILITY COMPANY
## OPERATING AGREEMENT
### For
## URBAN COMMONS CRENSHAW BLVD, LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT is effective as of October 31, 2018 by and among the individuals and entities identified on the signature pages attached to this Agreement and listed on Exhibit "A" attached hereto (referred to individually as a "Member" and collectively as the "Members").

<u>Recitals</u>

A.      The Members have formed a limited liability company (the "Company") under the Title 2.6 California Revised Uniform Limited Liability Company Act (the "Act") by filing a Certificate of Formation with the California Secretary of State.

B.      The Members enter into this Agreement to form and provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

## ARTICLE I:

## DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement.

1.1      "Act" is defined in Recital A.

1.2      "Adjusted Capital Account Deficit" is defined in Section 4.3(a).

1.3      "Affiliate" of a Member or a Manager means (a) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member or (b) the parent, spouse, sibling (including the sibling's spouse) or child (including the child's spouse) of any Member, Manager or Person with direct or indirect, through one or more intermediaries, control over any Member or Manager. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.4      "Agreement" means this Limited Liability Company Operating Agreement, as originally executed and as amended from time to time.

1.5      "Assignee" means a Person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.6      "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.7      "Available Capital Proceeds" means, with respect to any fiscal year, the net cash proceeds remaining in the Company and available for distribution derived from any Capital Event,

after deduction of amounts required for all expenses incurred by the Company in connection with obtaining such proceeds and any amounts required for the payment of Company indebtedness, as determined by the Manager(s).

1.8    "Available Cash Flow" means all cash received from Company operations not including amounts received as Capital Contributions, reduced by all cash paid as determined by the Manager(s), including payment of Company indebtedness or amounts used to establish Reserves.

1.9    "Award" is defined in Section 8.5(a).

1.10    "Book Depreciation" is defined in Section 4.3(b).

1.11    "Bona Fide Offer" is defined in Section 8.3.

1.12    "Capital Account" means, with respect to any Member, the account reflecting the capital interest of the Member in the Company, consisting of the Member's initial Capital Contribution maintained and adjusted in accordance with Section 3.4.

1.13    "Capital Contribution" means, with respect to any Member, the amount of money and the fair market value of any property (other than money) at the time such property is contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC Section 752) (a) in consideration of a Capital Percentage Interest held by such Member or (b) as additional Capital Contributions made in accordance with Sections 3.2 and 3.3.  A Capital Contribution shall not be deemed a loan.

1.14    "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Property, the receipt of proceeds from a refinancing of Property, or a similar event with respect to Property or assets.

1.15    "Capital Percentage Interest" means the ratio of a Member's total Capital Contributions to the total Capital Contributions by all Members expressed as a percentage and represents a Member's entire Economic Interest in the Company, including a Member's share of the Company's Profits, Losses and distributions of the Company's Available Cash Flow and Available Capital Proceeds pursuant to this Agreement.  The Membership List shall be amended upon the admission of any new Members to the Company and upon any adjustments to a Member's Capital Percentage Interest pursuant to the terms and conditions of this Agreement. The initial Capital Percentage Interests of the Members are listed on Exhibit "A" attached hereto.

1.16    "Certificate of Formation" is defined in Section 2.7.

1.17    "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.18    "Company" means the company named in Section 2.2 of this Agreement.

1.19    "Company Minimum Gain" is defined in Section 4.3(c).

1.20    "Economic Interest" means a Person's share of (a) the Company's items of income, gain, deduction, loss and expense, and (b) the distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member,

2

including, without limitation, the right to vote or participate in the management of the Company, or any right to information concerning the business and affairs of the Company.

1.21    "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.22    "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.23    "Expiration Date" is defined in Section 8.5.

1.24    "Fair Option Price" is defined in Section 8.8.

1.25    "Gross Asset Value" means, with respect to any item of Property, the item's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any item of property contributed by a Member to the Company shall be the fair market value of such property, as mutually agreed by the contributing Member and the Company;

(b)    The Gross Asset Value of any item of Property distributed to any Member shall be the fair market value of such item of Property on the date of distribution; and

(c)    The Gross Asset Value of any item of Property shall be subject to the adjustments specified in Section 4.9.

1.26    "Indemnified Party" is defined in Section 10.1.

1.27    "Initial Members" means those Persons whose names are set forth on the original Membership List maintained by the Company and are listed on Exhibit "A" attached hereto.  A reference to an "Initial Member" means any of the Initial Members.

1.28    "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.29    "IRR" means the annualized discount rate, determined by iterative process on a cumulative basis, which results in a net present value of zero, calculated and compounded on a monthly basis (as calculated using the XIRR function using Excel or equivalent accounting program), when such discount rate is applied to specified Capital Contributions from the date when such contributions were made and to specified distributions to the date such distributions were initially made.  A further explanation and sample Internal Rate of Return calculation is attached hereto as Exhibit "B."

1.30    "Liabilities" is defined in Section 10.1.

1.31    "Losses" is defined in Section 4.2.

1.32    "Major Decision" means the decision by the Manager(s) and a Majority of Members on behalf of the Company to do any of the following:  (a) the merger of the Company

with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member); (b) any act which would make it impossible to carry on the ordinary business of the Company, except as expressly provided in the last paragraph of Section 5.1; (c) the confession of a judgment against the Company if the amount of the judgment is in excess of Three Hundred Thousand Dollars ($300,000) and is not covered by insurance carried by the Company; (d) the incurring of any capital expense that costs in excess of Five Hundred Thousand Dollars ($500,000) unless such capital expense had been accounted for in the operating budgets for the Company; (e) lending money to, or guaranteeing the debts or other obligations of, a Member or any other Person; (f) the filing of a petition in bankruptcy or the entering into of an arrangement among creditors; (g) the entering into, on behalf of the Company, of any transaction constituting a "reorganization"; and (h) the compromise of any obligation of a Member to make a Capital Contribution or return an improper distribution.

1.33    "Majority of Members" means a Member or Members whose Percentage Interests when taken together represent more than 50% of the Percentage Interests of all the Members.

1.34    "Manager" or "Managers" means the Person(s) named as such in Section 2.9 or the Persons who from time to time succeed any Person as a Manager and who, in either case, are serving at the relevant time as a Manager.

1.35    "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, for as long as it continues to own such Membership Interest.

1.36    "Member Nonrecourse Debt" is defined in Section 4.3(d).

1.37    "Member Nonrecourse Debt Minimum Gain" is defined in Section 4.3(e).

1.38    "Member Nonrecourse Deductions" is defined in Section 4.3(f).

1.39    "Membership Interest" means a Member's rights in the Company, including the Member's Capital Percentage Interest and Percentage Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.40    "Membership Interest Certificates" is defined in Section 7.3.

1.41    "Non-Contributing Member" is defined in Section 3.3.

1.42    "Nonrecourse Deductions" is defined in Section 4.3(g).

1.43    "Nonrecourse Liability" is defined in Section 4.3(h).

1.44    "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service or other similar overnight delivery service, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

4

1.45    "Option Date" is defined in Section 8.6.

1.46    "Partner" is defined in Section 6.6.

1.47    "Percent of the Members" means the specified total of Percentage Interests of all the Members.

1.48    "Percentage Interest" means the ownership interest of a Member in the Company from time-to-time, including a Member's right to Vote on Company matters.  The Membership List shall be amended upon the admission of any new Members to the Company and upon any adjustments to a Member's Percentage Interest pursuant to the terms and conditions of this Agreement.  The initial Percentage Interests of the Members are listed on Exhibit "A" attached hereto.

1.49    "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.50    "Profits" and "Losses" are defined in Section 4.2.

1.51    "Property" means that certain property known as 1027 Crenshaw Blvd., Los Angeles, CA, and any other tangible or intangible, real or personal property contributed to or acquired or owned directly or indirectly by the Company.

1.52    "Proxy" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the voting rights of that Member.

1.53    "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.54    "Reserves" means the aggregate of reserve accounts that the Manager(s), in the Manager's(s') sole discretion, deems reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, and working capital requirements.

1.55    "Secretary" is defined in Section 6.7(b).

1.56    "Selling Member" is defined in Section 8.4.

1.57    "Subsidiary" is defined in Section 2.5.

1.58    "Substituted Member" is defined in Section 8.9.

1.59    "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.60    "Tax Item" means each item of income, gain, loss, deduction, or credit of the Company.

1.61    "Tax Matters Member" means such Person as may be designated under Section 6.6.

1.62    "Transfer" means, with respect to a Membership Interest or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of such a Membership Interest or any element of such Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.63    "Triggering Event" is defined in Section 8.4.

1.64    "Unreturned Capital Contributions" means, with respect to a Member, such Member's Capital Contributions that have not been returned to such Member pursuant to Section 4.12(a).

1.65    "Urban Commons" means Urban Commons, LLC, a Delaware limited liability company.

1.66    "Voluntary Contributing Member" is defined in Section 3.3.

1.67    "Vote" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.68    "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company as provided under this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II:

## ORGANIZATION

2.1    The Manager(s) has caused the Certificate of Formation for the Company to be executed and filed with the Secretary of State of the State of California.

2.2    The name of the Company is **URBAN COMMONS CRENSHAW BLVD, LLC**.

2.3    The mailing address of the Company shall be at 10250 Constellation Blvd., Suite 1750, Los Angeles, CA, 90067, or such other place or places as may be determined by the Manager(s) from time to time.

2.4    The purpose of the Company is to (a) acquire, own, develop, redevelop, operate, manage, lease, finance and/or sell the Property, and to do all things necessary, convenient or incidental to the foregoing, (b) carry on any other lawful business, purpose or activity, whether or not for profit, to the fullest extent provided in the Act, as the Majority of Members may agree, and (c) to do all things necessary, convenient or incidental to each of the foregoing.

2.5    The Members intend the Company to be a limited liability company under the Act. Neither the Manager(s) nor any Member shall take any action inconsistent with the express intent of the parties to this Agreement.

2.6    The term of existence of the Company commenced upon the filing of the Certificate of Formation of the Company (the "Certificate of Formation") with the Secretary of State of the State of California, and shall continue until the Company is dissolved and wound up pursuant to Article VI.

2.7     The names and addresses of the Initial Members are set forth on Exhibit "A" attached hereto.

2.8     The initial Manager of the Company will be Urban Commons:

> Urban Commons, LLC
> 10250 Constellation Blvd Suite 1750
> Los Angeles, California  90067
> Phone No.:  (949) 400-8808
> Attention:  Taylor Woods

## ARTICLE III:

## CAPITAL AND CAPITAL CONTRIBUTIONS

3.1     Each Member shall contribute to the capital of the Company as the Member's initial Capital Contribution the money and property specified on the Subscription Agreement signed by the Member.  The initial fair market value of each item of contributed property (net of liabilities secured by such property) that the Company is considered to assume or to take "subject to" under IRC Section 752, is also set forth on the Subscription Agreement, together with the description and amount of these liabilities.  If a Member fails to make the initial Capital Contributions specified in this Section by within 30 days of signing the Subscription Agreement, that Member's entire Membership Interest shall terminate, and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make the initial Capital Contribution.

3.2     The Manager(s) does not anticipate that any additional Capital Contributions will be required from the Members in addition to the initial Capital Contributions made by the Members in accordance with Section 3.1 above.  However, if the Manager(s) reasonably determines from time to time that additional cash capital contributions are needed to carry out the purposes of the Company (in connection with making such determination the Manager(s) will take into account any projected Available Cash Flow which may be available and the availability of additional financing to pay for any such items), the Manager(s) shall deliver written notice to the Members as to the amount of additional capital that is needed. Within thirty (30) days after receipt of such written notice, each Member may, but without any obligation to do so, make additional cash Capital Contributions to the Company in an amount equal to the product obtained by multiplying its Capital Percentage Interest by the additional capital amount that the Manager(s) reasonably determined is necessary to carry out the purposes of the Company.

3.3     If any Member (a "Non-Contributing Member") shall decide not to make any additional Capital Contribution within such thirty (30) day period then, within the following ten (10) day period, all or any portion of the contributing Members (such contributing Members who elect to make such additional Capital Contribution in place of the Non-Contributing Member shall be hereinafter referred to as a "Voluntary Contributing Member") may, pro rata in accordance with the Voluntary Contributing Members' aggregate Capital Percentage Interests, make such additional Capital Contribution(s) in place of the Non-Contributing Member; in which case the Capital Percentage Interests of the Non-Contributing Member and the Voluntary Contributing Members shall be adjusted so that each such Member's Capital Percentage Interest shall equal a fraction, which shall be expressed as a percentage, the numerator of which is the Capital Contributions, including the additional Capital Contributions, made by such Member and the denominator of which is the total Capital Contributions, including the additional Capital Contributions, made by all Members.  All such adjustments to the Capital Percentage Interests of

the Non-Contributing Member and the Voluntary Contributing Members shall be effective immediately after the making by the Voluntary Contributing Members of the additional Capital Contributions in place of the Non-Contributing Member.

3.4    An individual Capital Account for each Member shall be maintained in accordance with the requirements of Reg Section 1.704-1(b)(2)(iv) and adjusted in accordance with the following provisions:

(a)    A Member's Capital Account shall be increased by that Member's Capital Contributions, that Member's share of Profits, and any items in the nature of income or gain that are specially allocated to that Member pursuant to Article IV.

(b)    A Member's Capital Account shall be increased by the amount of any Company liabilities assumed by that Member subject to and in accordance with the provisions of Reg Section 1.704-1(b)(2)(iv)(c).

(c)    A Member's Capital Account shall be decreased by (a) the amount of cash distributed to that Member; (b) the fair market value of any Property so distributed, net of liabilities secured by such distributed Property that the distributee Member is considered to assume or to be subject to under IRC Section 752; and (c) the amount of any items in the nature of expenses or losses that are specially allocated to that Member pursuant to Article IV.

(d)    A Member's Capital Account shall be reduced by the Member's share of any expenditures of the Company described in IRC Section 705(a)(2)(B) or which are treated as IRC Section 705(a)(2)(B) expenditures pursuant to Reg Section 1.704-1(b)(2)(iv)(i) (including syndication expenses and losses nondeductible under IRC Sections 267(a)(1) or 707(b)).

(e)    If any Economic Interest (or portion thereof) is transferred, the transferee of such Economic Interest or portion shall succeed to the transferor's Capital Account attributable to such interest or portion.

(f)    The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Reg Section 1.704-1(b)(2)(iv)(d)(2).

(g)    Each Member's Capital Account shall be increased or decreased as necessary to reflect a revaluation of the Company's property assets in accordance with the requirements of Reg Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g), including the special rules under Reg Section 1.701-1(b)(4), as applicable. The provisions of this Agreement respecting the maintenance of Capital Accounts are intended to comply with Reg Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with those Regulations.

3.5    A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.6    No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account except as provided in this Agreement.

3.7    A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in this Agreement.

3.8    Except as otherwise expressly provided in the Act or in this Agreement, no Member shall have priority over any other Member with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits, or items thereof.

## ARTICLE IV:

## ALLOCATIONS AND DISTRIBUTIONS

4.1    (a)    Profits shall be allocated among the Members as follows:

(1)    First, to the Members to the extent of, and in proportion to, the cumulative Losses, if any, previously allocated to such Members pursuant to Sections 4.1(b)(2), reduced by any prior allocations of Profits pursuant to this Section 4.1(a)(1).

(2)    Second, to the Members to the extent of, and in proportion to, the excess, if any, of the cumulative Losses previously allocated to each such Member pursuant to Section 4.1(b) (including any such Losses described in Section 4.1(b)(2)) over the cumulative Profits previously allocated to such Member pursuant to Section 4.1(a), until such excess is entirely eliminated with respect to each such Member.

(3)    Third, to the Members in accordance with and to the extent of distributions made in accordance with Sections 4.11(a), 4.11(b), 4.11(c) and 4.11(d), in that order.

(4)    Fourth, to the Members in accordance with and to the extent of distributions made in accordance with Sections 4.12(b), 4.12(c), 4.12(d) and 4.12(e), in that order.

(b)    Losses shall be allocated among the Members as follows:

(1)    To the Members to the extent of and in proportion to the cumulative Profits, if any, previously allocated to such Members pursuant to Sections 4.1(a)(4) and (3), in that order, reduced in each case by any prior allocations of offsetting Losses pursuant to this Section 4.1(b)(1).

(2)    Thereafter, one hundred percent (100%) to the Members based on the Members' Capital Percentage Interests.

(c)    Notwithstanding Sections 4.1(a) and (b) above, to the extent the Code requires that Losses be allocated other than as set forth in Section 4.1(b) ("Tax Loss Allocations"), gross income and Profits shall be allocated so as to minimize as quickly as possible the difference between the balances in a Member's Capital Account reflecting such Tax Loss Allocations and what the Capital Account balances would be absent such Tax Loss Allocations.

4.2    As used in this Agreement, "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC Section 703(a), including all Tax

Items required to be stated separately pursuant to IRC Section 703(a)(1), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in IRC Section 705(a)(2)(B) or treated as IRC Section 705(a)(2)(B) expenditures pursuant to Reg Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or shall increase such loss;

(c) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the fair market value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its fair market value;

(d) In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation for such fiscal year or other period, computed in accordance with the definition of "Book Depreciation" in Section 4.3(b); and

(e) Notwithstanding the foregoing provisions of this Section 4.2, any items of income, gain, loss, or deduction that are specially allocated shall not be taken into account in computing Profits or Losses under Section 4.1.

4.3 The following definitions shall apply with respect to this Article IV.

(a) "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after such Member's Capital Account has been adjusted as follows: (1) the Member's Capital Account shall be increased by the amount of such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and (2) the Member's Capital Account shall be decreased by the amount of the items described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with that Regulation.

(b) "Book Depreciation" means, with respect to any item of Property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for such item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the fair market value of that item at the beginning of the fiscal year (or the acquisition date during the fiscal year), by (2) the federal adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Manager(s) may determine Book Depreciation, provided that the Manager(s) does so in a reasonable and consistent manner.

(c) "Company Minimum Gain" has the meaning set forth in Reg Section 1.704-2(d)(1).

(d)     "Member Nonrecourse Debt" is defined in Reg Section 1.704-2(b)(4).

(e)     "Member Nonrecourse Debt Minimum Gain" for a fiscal year of the Company means the net increase in Minimum Gain attributable to Member Nonrecourse Debt, determined as set forth in Reg Section 1.704-2(i)(2).

(f)     "Member Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(i)(2). For any fiscal year of the Company, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt equals the net increase during that fiscal year in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year, reduced (but not below zero) by the amount of any distributions during such year to the Member bearing the economic risk of loss for such Member Nonrecourse Debt if such distributions are both from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, all as determined according to the provisions of Reg Section 1.704-2(i)(2). In determining Member Nonrecourse Deductions, the ordering rules of Reg Section 1.704-2(j) shall be followed.

(g)     "Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(c).  The amount of Nonrecourse Deductions for a Company fiscal year equals the net increase in the amount of Company Minimum Gain during that fiscal year, reduced (but not below zero) by the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain.

(h)     "Nonrecourse Liability" is defined in Reg Section 1.752-1(a)(2).

4.4     The following special allocations shall be made in the following order:

(a)     Company Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be allocated, before any other allocation under this Section, items of Company income and gain for such fiscal year equal to such Member's share of the net decrease in Company Minimum Gain as determined in accordance with Reg Section 1.704-2(g)(2).

(b)     Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year, any Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt as of the beginning of such fiscal year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. A Member's share of net decrease in Member Nonrecourse Debt Minimum Gain shall be determined pursuant to Reg Section 1.704-2(i)(3). A Member shall not be subject to the foregoing chargeback to the extent permitted under Reg Section 1.704-2(i)(4).

(c)     Qualified Income Offset. If any Member unexpectedly receives an adjustment, allocation, or distribution described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), such Member shall be allocated items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income and gain for such fiscal year) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustment, allocation, or distribution.

4.5     Nonrecourse Deductions, as defined in Reg Section 1.704-2(c), for any fiscal year of the Company shall be allocated to the Members in the same proportion as Losses are allocated under Section 4.1(b)(2), provided that any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Reg Section 1.704-2(i)(2).

4.6     Any unrealized appreciation or unrealized depreciation in the values of Property distributed in kind to Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the Property and such Profits or Losses shall be allocated to the Capital Accounts in the same proportions as Profits are allocated under Section 4.1.  Any Property so distributed shall be treated as a distribution to the Members to the extent of the fair market value of the Property, less the amount of any liability secured by and related to the Property.  Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value.  For the purposes of this Section 4.6, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such Property and the Company's federal adjusted tax basis for such Property.

4.7     Any item of income, gain, loss, or deduction with respect to any Property (other than cash) that has been contributed by a Member to the capital of the Company, or that has been revalued pursuant to the provisions of Section 3.4(g), and that is required or permitted to be allocated to such Member for income tax purposes under IRC Section 704(c) in order to take into account the variation between the tax basis of such Property and its fair market value at the time of its contribution, shall be allocated solely for income tax purposes in the manner required or permitted under IRC Section 704(c) using the "traditional" method described in Reg Section 1.704-3(b), except that any other method allowable under applicable Regulations may be used for any contribution of Property with respect to which there is agreement among the contributing Member and the Manager(s) (and, if the Manager(s) and the contributing Member are Affiliates, a Majority of Members who are not Affiliates of the Manager(s)).

4.8     In the case of a Transfer of an Economic Interest during any fiscal year of the Company, the Assigning Member and Assignee shall each be allocated Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.  If the Assigning Member and Assignee agree to a different proration and advise the Manager(s) of the agreed proration before the date of the Transfer, Profits or Losses from a Capital Event during that fiscal year shall be allocated to the holder of the Interest on the day such Capital Event occurred.  If an Assignee makes a subsequent Assignment, said Assignee shall be considered an "Assigning Member" with respect to the subsequent Assignee for purposes of the aforesaid allocations.

4.9     (a)     The Gross Asset Value of all Property shall be adjusted as of the following times: (i) the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution of money or other Property (other than a de minimis amount) by the Company to a Member as consideration for an Economic Interest in the Company, and (iii) the liquidation of the Company within the meaning of Reg Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments under clauses (i) and (ii) above shall be made only in the event of a revaluation of Property under Section 3.4(g) in accordance with Reg Section 1.704-1(b)(2)(iv)(f);

        (b)     The Gross Asset Value of Property shall be increased or decreased to reflect adjustments to the adjusted tax basis of such Property pursuant to IRC Section 732, IRC Section 733, or IRC Section 743, subject to the limitations imposed by IRC Section 755 and Reg Section 1.704-1(b)(2)(iv)(m); and

(c)     If the Gross Asset Value of an item of Property has been determined or adjusted pursuant to Section 1.25 or Paragraph (a) or (b) of this Section 4.9, such Gross Asset Value shall be adjusted by the Book Depreciation, if any, taken into account with respect to such Property for purposes of computing Profits and Losses.

4.10     It is the intent of the Members that each Member's allocated share of Company Tax Items be determined in accordance with this Agreement to the fullest extent permitted by IRC Sections 704(b) and 704(c).   Notwithstanding anything to the contrary contained in this Agreement, if the Company is advised that, as a result of the adoption of new or amended regulations pursuant to IRC Sections 704(b) and 704(c), or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Manager(s) is hereby granted the power to amend the allocation provisions of this Agreement, on advice of accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes.

4.11     Available Cash Flow, excluding revenues or proceeds from a Capital Event or the dissolution of the Company, shall be distributed among the Members at least annually as determined by the Manager(s) as follows:

(a)     Eighty-five percent (85%) to the Members based on the Members' Capital Percentage Interests pro rata and fifteen percent (15%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is equal to fifteen percent (15%) or less;

(b)     Eighty percent (80%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty percent (20%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than fifteen percent (15%) but not more than thirty percent (30%);

(c)     Seventy-five percent (75%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty-five percent (25%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than thirty percent (30%) but not more than forty-five percent (45%); and

(d)     Seventy percent (70%) to the Members based on the Members' Capital Percentage Interests pro rata and thirty percent (30%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than forty-five percent (45%).

4.12     All revenues or proceeds from a Capital Event or the dissolution of the Company shall be distributed among the Members as determined by the Manager(s) as follows:

(a)     First, to the Members pro rata in proportion to the Members' Unreturned Capital Contributions until each Member has recovered his or her Unreturned Capital Contributions;

(b)     Thereafter, eighty-five percent (85%) to the Members based on the Members' Capital Percentage Interests pro rata and fifteen percent (15%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is equal to fifteen percent (15%) or less;

(c)     Eighty percent (80%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty percent (20%) to Urban Commons if the IRR on the

aggregate Capital Contributions made by the Members is greater than fifteen percent (15%) but not more than thirty percent (30%);

      (d)    Seventy-five percent (75%) to the Members based on the Members' Capital Percentage Interests pro rata and twenty-five percent (25%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than thirty percent (30%) but not more than forty-five percent (45%); and

      (e)    Seventy percent (70%) to the Members based on the Members' Capital Percentage Interests pro rata and thirty percent (30%) to Urban Commons if the IRR on the aggregate Capital Contributions made by the Members is greater than forty-five percent (45%).

      4.13    The distribution procedures in Sections 4.11 and 4.12 are further described (and examples of such procedures are provided) in Exhibit "B" attached hereto.  If, as a result of the IRR increasing above a threshold percentage and thus causing the distribution percentages to be adjusted as described in Sections 4.11 and 4.12, the total distributions to the Members (other than Urban Commons) are reduced below the distributions that would be made to such Members if the IRR had not increased above such threshold percentage and the distribution percentages adjusted, the Manager(s) shall continue to make distributions to the Members based on the distribution percentages at the lower IRR level until such time as the total distributions to the Members (other than Urban Commons) are greater at the higher IRR level and adjusted percentages then such distributions would be if the IRR had not increased above such threshold percentage.

      4.14    If the proceeds from a sale or other disposition of an item of Property consist of Property other than cash, the value of that Property shall be as reasonably determined by the Manager(s) based on the current fair market value of the Property.  If such non-cash proceeds are subsequently reduced to cash, such cash shall be taken into account by the Manager(s) in determining Available Cash.

      4.15    Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members' Capital Accounts under this Article IV, and other credits and deductions to the Members' Capital Accounts shall be made before the final distribution is made.  The final distribution to the Members shall be made as provided in Section 9.2(d) of this Agreement.  The provisions of this Section 4.14 and Section 9.2(d) shall be construed in accordance with the requirements of Reg Section 1.704-1(b)(2)(ii)(b)(2).

      4.16    For purposes of allocating Profits and Losses under this Article IV, adjusting Capital Accounts and complying with applicable IRC and Reg Sections, the terms "Member" and "Members" shall be deemed to include Urban Commons.

## ARTICLE V:

## MANAGEMENT

      5.1    The business of the Company shall be managed by the Persons named as Manager(s) in Section 2.9 or any successors, selected as provided in Section 5.3.  The Manager(s) may, but need not, be Members.  If any of the Managers ceases to serve as a Manager (whether due to death, disability, dissolution or otherwise), then the remaining Manager(s) shall have all of the management power and authority of the Manager(s) as set forth in this Agreement.  Except as

otherwise provided in this Agreement, all decisions concerning the management of the Company's business shall be made by the majority Vote of the Managers, if more than one Manager exists, and the Manager(s) shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities with respect to the management of the Company's business, property and affairs on such basis and in such manner as determined by the Manager(s). In carrying out the purposes of the Company described in Section 2.5, the Manager(s)'s responsibilities shall include, but not be limited to, acquiring, developing, constructing, operating, managing and directing the affairs of the Property; overseeing the marketing and sale of the Property; managing the accountants with respect to the preparation of tax returns and other tax and financial matters; obtaining appropriate insurance; and managing any leasing activities on the Property.

Without limiting the generality of the foregoing and in connection with the Manager(s) fulfilling its obligations under this Agreement, provided that all Major Decisions have been approved by a Majority of Members, the Manager(s) shall have power and authority on behalf of the Company (whether on its own behalf or in its capacity as the sole member and/or manager of the Subsidiary):

(a)      To acquire tangible or intangible, real or personal property from any Person, and to develop, renovate, improve, lease, subdivide, sell, assign, convey or otherwise transfer title to any portion of, or interest in, Property. In connection with the management and operation of the Property, the Manager(s) shall retain, enter into contracts with and pay any management company providing management services for the Property fair market rates from a portion of Property revenue and net operating income according to industry standards for providing such services;

(b)      To purchase, lease or otherwise acquire or obtain the use of machinery, equipment, tools, staff and personnel, and material, and other types of property that may be deemed necessary or desirable in connection with carrying on the business of the Company;

(c)      To borrow money for the Company from banks, other lending institutions, the Members, Affiliates of the Members or any other Person (as hereinafter defined) on such terms as the Manager(s) deems appropriate, and in connection with such borrowing, to hypothecate, encumber, and grant security interests in the assets of the Company to secure repayment of the borrowed sums, to have the Company guaranty or become surety for repayment of the borrowed sums or to have the Company indemnify any Member against any personal liability for repayment of the borrowed sums to the extent such Member guarantees repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager(s), or to the extent permitted under this Agreement, by agents or employees of the Company expressly authorized by the Manager(s) to contract such debt or incur such liability;

(d)      To prepay in whole or in part, refinance, recast, increase, modify, consolidate, correlate, or extend, on such terms as the Manager(s) may deem proper, any debts of the Company;

(e)      To purchase (i) liability and other insurance to protect the Property, the business of the Company and the Members and Manager(s); (ii) wrap insurance policies in connection with construction of improvements on the Property; and (iii) any other insurance that the Manager(s) deem proper for the Company, consistent with industry standards for other companies engaging in similar businesses.

15

(f)     To hold and own any Property in the name of the Company;

(g)     To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term government obligations, commercial paper, or other low risk type investments;

(h)     To sell or otherwise dispose of, whether or not in the ordinary course of business, all or substantially all of the assets of the Company as part of a single transaction or plan so long as the disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound or in contravention of state law;

(i)     To execute on behalf of the Company all instruments and documents, including, without limitation: checks; drafts; notes and other negotiable instruments; mortgages, or deeds of trust; guaranties; dispositions of Property; assignments; bills of sale; leases; management agreements; construction contracts; partnership agreements; operating agreements of other limited liability companies; intercreditor agreements; reliance letters; economic disclosure letters; UCC documents and resolutions; easement agreements; guarantees; pledge and security agreements; purchase and sale agreements; any kind of third party service agreements; subordination agreements; and any other instruments or documents necessary, in the opinion of the Manager(s), to the best interests of the business of the Company;

(j)     To employ or engage the services of accountants, accounting firms, legal counsel, law firms, managing agents, development managers, property managers, brokers or other companies or employees or agents to perform services for the Company and to compensate them from Company funds in such manner and on such basis as reasonably determined by the Manager(s);

(k)     To enter into any and all other reasonable agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Manager(s) may approve;

(l)     To adjust, compromise, settle or refer to arbitration any claims in favor of or against the Company or any nominee of the Company or any property held or owned by the Company or its nominee, and to institute, prosecute and defend any legal proceedings as the Manager(s) shall deem advisable;

(m)     To effect the sale, exchange or other disposition of all, or substantially all, of the Company's assets in the liquidation and winding up of the business of the Company upon its duly authorized dissolution and/or in accordance with Section 5.1(h), above;

(n)     To authorize any Manager, acting alone, to exercise any of the rights, powers and/or authority of the Manager(s) under this Agreement and to bind the Company;

(o)     To do and perform all other acts as deemed necessary or appropriate by Manager(s) in connection with the conduct of the Company's business; and

(p)     To take any of the above actions with respect to any entity in which the Company owns a direct or indirect interest including, without limitation, the Subsidiary.

Unless authorized to do so by the Manager(s), no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniary for any purpose.

Without limiting the generality of the foregoing, but notwithstanding any other Section of this Agreement to the contrary, the Manager(s) shall have the unilateral right, power, and authority at any time to sell or otherwise dispose (or cause the sale or other disposition) of all of the Company's direct or indirect interests in the Property, so long as following distribution of the Available Capital Proceeds resulting from such sale or other disposition, each Member will have received aggregate distributions from the Company of no less than the Minimum Multiple Percentage of such Member's aggregate Capital Contributions to the Company.  For purposes hereof, "Minimum Multiple Percentage" means a percentage equal to the sum of 130% plus the product of (x) 30% multiplied by (y) the number of complete 12 month periods that elapse between the Company's (or Subsidiary's) acquisition of the Property and the closing of such sale or other disposition (e.g., if the sale or other disposition closes prior to the first anniversary of the Company's acquisition of the Property, the Minimum Multiple Percentage will be 130%; if the sale or other disposition is effected on or after the first anniversary, but prior to the second anniversary, of the Company's acquisition of the Property, the Minimum Multiple Percentage will be 160%, etc.).

5.2     Urban Commons shall serve as the initial Manager of the Company until Urban Commons' resignation as Manager.  Urban Commons is a member managed limited liability company with Howard Wu and Taylor Woods currently being the only members of Urban Commons.  During any period that Urban Commons is serving as the Manager of the Company, all Major Decisions of the Company shall require the unanimous approval of Howard Wu and Taylor Woods as the managing members of Urban Commons prior to approving any Major Decisions on behalf of the Company, as well as approval by a Majority of Members.  In the event of any dispute between Howard Wu and Taylor Woods that prevents Howard Wu and Taylor Woods from reaching an unanimous decision with respect to any Major Decisions of the Company requiring the unanimous approval of Howard Wu and Taylor Woods, said dispute shall be resolved by submission to binding arbitration in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California in accordance with its rules and procedures regarding commercial disputes.

5.3     Each Manager, other than the initial Manager, shall be appointed by the Manager(s) or, if there is no Person serving as a Manager at that time, by a Majority of Members for (a) a term expiring with the appointment of a successor, or (b) a term expiring at a definite time specified by the Manager(s) or, if applicable, a Majority of Members in connection with such appointment.  A Manager, other than the initial Manager, may be removed on the vote of a Majority of Members.  For purposes of this Section 5.3, if the Manager is also a Member, the Manager's Percentage Interest shall not be taken into account in determining whether a Majority of Members have voted to remove the Manager.  The initial Manager may be removed solely for cause (as specifically defined in subsections (i)-(iv) below) by the affirmative vote of a Majority of Members at a meeting called expressly for that purpose, or by the written consent of a Majority of Members.  Such Members must deliver to the initial Manager a written notification of removal stating in reasonable detail the cause for that action ("Removal Notice").  The only grounds for removal for cause shall be either (i) any willful misconduct or material breach; or (ii) any fraud, gross negligence or willful misconduct in the performance by Manager of its obligations or covenants under this Agreement; or (iii) the Manager's making a Major Decision without first obtaining the affirmative vote or written consent of a Majority of Members, or (iv) Taylor Woods or Howard Wu shall no longer, due to death, disability or any other reason, actively and reasonably carry out or direct the performance by Urban Commons of the Manager's duties under this Agreement.  The initial Manager may not be removed for financial performance reasons unless said financial performance results from any of the causes described in subsections (i)-(iv) above.

Except as otherwise provided in this Section, if within twenty (20) days after its receipt of a Removal Notice (or longer, if such situation cannot by its nature be cured in twenty (20) days and the initial Manager has actively commenced and diligently continues to pursue a cure for the situation), the initial Manager fails to cure the situation described in subsections (i), (ii), (iii) or (iv) that gave rise to such Removal Notice, the Members may elect a new Manager by the affirmative vote or written consent of a Majority of Members. The initial Manager may, within twenty (20) days after its notification in writing of its removal for cause, file an objection with the Company that its removal was not justified. If its objection is timely filed, the question of whether its removal was justified shall be submitted to arbitration under Section 10.2 below on an expedited basis in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California. If such Rules conflict or are inconsistent with any provision of this Agreement, the provisions of this Agreement shall prevail.

The parties shall use commercially reasonable efforts to cause the arbitration to be completed no later than sixty (60) days after it was commenced. Each party waives any right that it may have to any substantive review of any arbitration award by the courts of the jurisdiction in which the arbitration is conducted and agrees that the award of the arbitrators in any such arbitration proceedings shall be final and without any right of appeal. The arbitration award may be entered as a final judgment in the court of any jurisdiction in which such entry shall be recognized under applicable law. Any arbitration award shall include an award of costs of the arbitration and attorneys' fees to the prevailing party.

The refusal or failure of any party to appear at or participate in any hearing or other portion of any arbitration proceeding pursuant to this Section shall not prevent any such hearing or proceeding from going forward, and the arbitrator is empowered to make its decision or render an award ex parte that shall be binding on the non-appearing party as fully as though that party had participated in the hearing or proceeding.

5.4     Actions of the Managers, if more than one Manager, shall be taken at meetings or as otherwise provided in this Section 5.4 by a majority of the Managers. No regular meetings of the Managers need be held.

The transactions of the Managers at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice and if, either before or after the meeting, each Manager not present signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes of such meeting.

Any action required or permitted to be taken by the Managers under this Agreement may be taken without a meeting if a majority of the Managers individually or collectively consent in writing to such action.

Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another.

The Managers shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, notices and waivers of notices of meetings, and all written consents to actions of the Managers.

5.5     It is acknowledged that the Manager(s) have other business interests to which the Manager(s) devote part of the Managers'(s') time. The Manager(s) shall devote to the Company such time as may be reasonably necessary for the proper performance of all duties hereunder and

shall be bound by the duty of good faith and fiduciary duty in its dealings with the Company and the Members, but the Manager(s) shall not be required to devote full time to the performance of such duties. Nothing in this Agreement shall be deemed to restrict in any way the rights of the Manager(s) or any Member, or of any Affiliate of the Manger(s) or any Member, to conduct any other business or activity whatsoever, and the Manager(s) or any Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of the Manager(s) or any other Member or the Manager(s) or Member's Affiliates.

5.6     The Manager(s) shall preside at all meetings of Members. The Manager(s) may provide for additional officers of the Company and shall establish the powers and duties of all other officers and the compensation of all Company officers, provided that such powers and duties are consistent with the authority granted to the Manager(s) in this Agreement. The signature of any Manager shall be necessary and sufficient to convey title to any Property owned, either directly or indirectly through one or more entities, by the Company or to execute any promissory notes, trust deeds, mortgages or other instruments of hypothecation, or to execute any other documents or instruments approved by the Manager(s), and all of the Members agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of a Manager shall be sufficient to execute any documents necessary to effectuate this or any other provision of this Agreement.

5.7     The Manager(s) shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.8     All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Manager(s). Withdrawal from such accounts shall require the signature of a Manager, or such other Person or Persons as the Manager(s) may designate.

5.9     In the event that a majority vote of the Manager(s) cannot be achieved on any matter requiring such a vote pursuant to this Article, then such impasse shall be broken by the Vote of a Majority of Members.

5.10     The Manager(s) may, on behalf of the Company and with the consent of a Majority of the Members, purchase or provide goods or services from the Manager(s), any Member and/or any of their Affiliates; provided that the amounts paid for, and other terms relating to the furnishing of, such goods or services may not be materially less advantageous to the Company than the amounts and terms for and upon which similar goods or services could be obtained or furnished in the same geographic area to or from good quality corporations or business enterprises which are not the Manager(s), a Member and/or their Affiliates. The foregoing authorization shall also apply to a sale or disposition of substantially all of the Company's assets to the Manager(s), any Member and/or any Affiliate prior to or following dissolution or upon winding-up or liquidation of the Company. Amounts paid to the Manager(s), any Member and/or any of their Affiliates either for goods or services in transactions authorized pursuant to this Section 5.10 shall be treated for all purposes as amounts paid to non-Members and any compensation or reimbursement received by any Member from any such Affiliate shall belong to it and not to the Company.

5.11    The Manager(s) shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct, or an intentional breach of this Agreement.  The Company shall indemnify the Manager(s) for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct or an intentional breach of this Agreement.

5.12    The Company hereby agrees to promptly reimburse the Manager(s) and any Affiliate of the Manager(s) for all reasonable and actual out-of-pocket costs incurred by them with respect to providing oversight and management of the Company, and for otherwise providing administrative services to the Company in connection with the offering of Membership Interests or in performing functions and services for the Company and otherwise in pursuit of the Company's business.  With respect to the operations of the Company following the acquisition of the Property, it is anticipated that the reasonable and actual out-of-pocket costs incurred by the Manager(s) in fulfilling their obligations under this Agreement shall be reimbursed from the cash flow from the Property but to the extent such costs are not paid as part of the Property expenses, then the Company shall reimburse the Manager(s) for such reasonable and actual out-of-pocket costs.

### ARTICLE VI:

### ACCOUNTS AND ACCOUNTING

6.1    Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager(s) shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member.

6.2    Financial books and records of the Company shall be kept on the method of accounting adopted by the Company for federal income tax purposes.  The financial statements of the Company shall be prepared in accordance with standard accounting principles and shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement.  The fiscal year of the Company shall be January 1 through December 31.

6.3    At all times during the term of existence of the Company, and beyond that term if the Manager(s) deem it necessary, the Manager(s) shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)    A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b)    A current list of the full name and business or residence address of each Manager;

(c)    A copy of the Certificate of Formation, as may be amended from time to time;

(d)    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e)     An original executed copy or counterparts of this Agreement, as may be amended from time to time;

(f)     Any powers of attorney under which the Certificate of Formation or any amendments to the Certificate of Formation were executed;

(g)     Financial statements of the Company for the six most recent fiscal years; and

(h)     The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If the Manager(s) deem that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by the Manager(s).

6.4     At the end of each fiscal year the books of the Company shall be closed and examined and statements reflecting the financial condition of the Company and its Profits or Losses shall be prepared, and a report thereon shall be issued by the Company's certified public accountant.  Copies of the financial statements shall be given to all Members.  In addition, the Manager(s) shall deliver to the Members within twenty (20) days following the end of each month, copies of such financial statements and performance reports regarding the previous month, as may be prepared in the ordinary course of business, by the Manager(s), the property manager or accountants selected by the Manager(s).  Upon request of any Member, the Manager(s) shall deliver to each Member, within one hundred twenty (120) days after the end of the fiscal year of the Company, a financial statement that shall include:

(a)     A balance sheet and income statement, and a statement of changes in the financial position of the Company as of the close of the fiscal year;

(b)     A statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year. Members holding at least seventy percent (70%) of the Capital Percentage Interests may request interim balance sheets and income statements, and may, at their own discretion and expense, obtain an audit of the Company books by certified public accountants selected by them; provided, however, that not more than one such audit shall be made during any fiscal year of the Company.

6.5     Within ninety (90) days after the end of each taxable year of the Company or as soon thereafter as reasonably practicable, the Manager(s) shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

6.6     Taylor Woods shall act as Tax Matters Member ("Partner") of the Company pursuant to IRC Section 6231(a)(7).

6.7     The Partner is hereby authorized to do the following:

(a)     Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC Section 6231(a)(3)) at the Company level, as required under IRC Section 6223(g) and the implementing Regulations;

(b)     Enter into settlement agreements under IRC Section 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the

21

"Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Member may expressly state that such agreement shall bind the other Members, except that such settlement agreement shall not bind any Member who (within the time prescribed under the Code and Regulations) files a statement with the Secretary providing that the Tax Matters Member shall not have the authority to enter into a settlement agreement on behalf of such Member;

       (c)     On receipt of a notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6226(a) and applicable Regulations;

       (d)     File requests for administrative adjustment of Company items on Company tax returns under IRC Section 6227(b) and applicable Regulations; and, to the extent such requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6228(a); and

       (e)     To take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Member may delegate such rights and duties as deemed necessary and appropriate.

       (f)     To take appropriate actions to achieve the most preferred tax benefits and advantages for the Members where possible.

## ARTICLE VII:

## MEMBERSHIP-MEETINGS, VOTING, INDEMNITY

      7.1     There shall be only one class of membership and no Member shall have any rights or preferences in addition to or different from those possessed by any other Member except as specifically provided for in Article IV.  Members shall have the right and power to appoint, remove, and replace Manager(s) and officers of the Company to the extent permitted under Article V and the right to Vote on all other matters with respect to which this Agreement requires or permits such Member action.  Each Member shall Vote in proportion to the Member's Percentage Interest as of the governing record date, determined in accordance with Section 7.2.  If a Member has assigned all or part of the Member's Economic Interest to a Person who has not been admitted as a Member, the Assigning Member shall Vote in proportion to the Percentage Interest that the Assigning Member would have had, if the assignment had not been made.

      7.2     The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager(s) or by a Majority of Members; provided that such record date shall not be more than sixty (60), or less than five (5) days prior to the date of the meeting or such distributions, as the case may be, and not more than sixty (60) days prior to any other action.

      7.3     The Company may, but shall not be required, to issue certificates evidencing Membership Interests ("Membership Interest Certificates") to Members of the Company.  Once Membership Interest Certificates have been issued, they shall continue to be issued as necessary

to reflect current Membership Interests held by Members. Membership Interest Certificates shall be in such form as may be approved by the Manager(s), shall be manually signed by the Manager(s), and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Company and Members set forth in Article VIII.  All issuances, re-issuances, exchanges, and other transactions in Membership Interests involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.

7.4     Meetings of the Members may be called by the Manager(s) and upon the written request of Member(s) holding seventy percent (70%) or more of the Capital Percentage Interests. The call shall state the nature of the business to be transacted.  Notice of any such meeting shall be given to all Members not less than five (5) days nor more than thirty (30) days prior to the date of such meeting.  Whenever the vote or consent of Members is permitted or required under this Agreement, such vote or consent may be given at a meeting of Members in person or by telephone or may be given by means of a written consent signed by Members holding the requisite percentage of Percentage Interests.  Except as otherwise expressly provided in this Agreement, the vote or consent of Members holding a majority of the Percentage Interests whether given in person, by telephone or by means of a written consent shall control.

7.5     Each Member may authorize any Person or Persons to act for him by Proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every Proxy must be signed by the Member or its attorney-in-fact.  No Proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the Proxy.  Every Proxy shall be revocable at the pleasure of the Member executing it unless otherwise provided in the Proxy.

7.6     Each meeting of Members shall be conducted by the Manager(s) or such other Person as the Manager(s) may appoint pursuant to such rules for the conduct of the meeting as the Manager(s) deem appropriate.  Unless otherwise agreed upon, all such meetings shall be held at the principal offices of the Company.

7.7     No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company.  Accordingly, each Member shall indemnify, defend, and save harmless each other Member and the Company from and against any and all loss, cost, expense, liability or damage arising from or out of any claim based upon any action by such Member in contravention of the first sentence of this Section 7.7.  This Section 7.7 supersedes any authority granted to the Members pursuant to the Act.

7.8     The Members acknowledge and agree that they shall not owe any fiduciary duty towards each other and each hereby waives any such fiduciary duty that may exist (whether express or implied) under law.

## ARTICLE VIII:

## TRANSFERS OF MEMBERSHIP INTERESTS

8.1     A Member may withdraw from the Company at any time by giving Notice of withdrawal to all other Members at least ninety (90) days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with and subject to the provisions of this Article VIII.

23

8.2     Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Membership Interest, whether now owned or later acquired, unless (a) the Member delivers Notice of such Transfer to the Company, (b) the Member provides such documentation and information regarding the Transfer as requested by the Manager(s), (c) the Manager(s) approve the transferee's admission to the Company as a Member upon such Transfer, which approval may be granted or withheld in the Manager's(s') sole discretion, (d) the Member and its assignee execute such documents and instruments as required by the Manager(s), (e) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding twelve (12) months, will not cause the termination of the Company under the Code, and (f) the Transfer does not violate any restrictions in any loan documents to which the Company is a party.  No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest unless such Encumbrance has been approved in writing by the Manager(s) which approval may be granted or withheld in the Manager's(s') sole discretion.  Any Transfer or Encumbrance of a Membership Interest without such approval shall be void.  Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to immediately family members of such Member, to an entity that is owned or controlled directly or indirectly by immediately family members or to a revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's issue.  As used herein, immediate family members shall include such Member's parents, spouse, siblings, children and grandchildren.  Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 8.2 in view of the purposes of the Company and the relationships of the Members.

8.3     If a Member wishes to transfer any or all of the Member's Membership Interest pursuant to a Bona Fide Offer (as defined below), the Member shall give Notice to all other Members at least thirty (30) days in advance of the proposed Transfer, indicating the terms of the Bona Fide Offer and the identity of the offeror.  The Company and the other Members shall have the option to purchase the Membership Interest proposed to be transferred at the price and on the terms provided in this Agreement.  If the price for the Membership Interest is other than cash, the fair value in dollars of the price shall be established in good faith by the Company.  For purposes of this Agreement, "Bona Fide Offer" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the transferring Member.  For thirty (30) days after the Notice is given, the other Members shall have the right to purchase a part of the Membership Interest offered in the proportion that the Member's Capital Percentage Interest bears to the total Capital Percentage Interests of all of the Members who choose to participate in the purchase, on the terms stated in the Notice, for the lesser of (a) the price stated in the Notice (or the price plus the dollar value of noncash consideration, as the case may be) and (b) the price determined under the appraisal procedures set forth in Section 8.8.

If the Members do not exercise the right to purchase all of the Membership Interest, then, with respect to the portion of the Membership Interest that the Members do not elect to purchase, that right shall be given to the Company for an additional thirty (30) day period, beginning on the day that the Members' right to purchase expires.  The Company shall have the right to purchase, on the same terms, the remaining portion of the Membership Interest of the offering Member; provided, however, that the participating Members and the Company may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member.

If the other Members and the Company do not exercise their rights to purchase all of the Membership Interest, the offering Member may, within ninety (90) days from the date the Notice is given and on the terms and conditions stated in the Notice, sell or exchange that Membership

Interest to the offeror named in the Notice. Unless the requirements of Section 8.2 are met, other than the requirement for approval by the Manager(s), the offeror under this section shall become an Assignee, and shall be entitled to receive only the share of Profits or other compensation by way of income and the return of Capital Contribution to which the assigning Member would have been entitled.

8.4     On the happening of any of the following events ("Triggering Events") with respect to a Member, the other Members and the Company shall have the option to purchase the Membership Interest of such Member ("Selling Member") at the price and on the terms provided in Section 8.8 of this Agreement:

(a)     The bankruptcy, or withdrawal of a Member, or the winding up and dissolution of a corporate Member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity; provided that the remaining Members have elected to continue the business of the Company as provided in Section 9.1(a).

(b)     The failure of a Member to make the Member's initial Capital Contribution pursuant to the provisions of Article III of this Agreement.

(c)     The occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

8.5     Notwithstanding any other provisions of this Agreement:

(a)     If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse (an "Award"), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion thereof, that was so transferred, and such former spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth below in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within one hundred eighty (180) days after the court award (the "Expiration Date"), the other Members and the Company shall have the option to purchase from the former spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

(b)     If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (i) that Member or (ii) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole trustee and the Member, as trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee shall sell the Membership Interest or portion thereof at the price set forth in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within one hundred eighty (180) days after the date of death (the "Expiration Date"), the other Members and the Company shall have the option to purchase from

25

the estate or other successor of the deceased spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

8.6     On the receipt of Notice by the Manager(s) and the other Members as contemplated by Sections 8.1, 8.3, and 8.5, and on receipt of actual notice of any Triggering Event as determined in good faith by the Manager(s) (the date of such receipt is hereinafter referred to as the "Option Date"), the Manager(s) shall promptly cause a Notice of the occurrence of such a Triggering Event to be sent to all Members and for thirty (30) days after the Notice is given, the other Members shall have the right to purchase, at the price and on the terms set forth in Section 8.8 of this Agreement, a part of the Membership Interest offered in the proportion that the Member's Capital Percentage Interest bears to the total Capital Percentage Interests of all of the Members who choose to participate in the purchase.  Following such thirty (30) day period, the Company shall then have the option, for a period of thirty (30) days thereafter, to purchase the Membership Interest not purchased by the other Members, on the same terms and conditions as apply to the Members.  The transferee of the Membership Interest that is not purchased shall hold such Membership Interest subject to all of the provisions of this Agreement.

8.7     Neither the Member whose interest is subject to purchase under this Article, nor such Member's Affiliate, shall participate in any Vote or discussion of any matter pertaining to the disposition of the Member's Membership Interest under this Agreement.

8.8     The purchase price of the Membership Interest that is the subject of an option under Section 8.6 shall be the "Fair Option Price" of the interest as determined under this Section 8.8.  "Fair Option Price" means the cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts on the Option Date.  Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree upon the Fair Option Price.  If the parties are unable to so agree within thirty (30) days of the Option Date, the Manager(s) shall appoint at the expense of the Company one MAI appraiser with a minimum of ten (10) years of commercial real estate experience.  The appraiser shall, within thirty (30) days after the appointment, determine the Fair Option Price of the Membership Interest in writing and submit its report to all the parties.  In the event either of the parties disagrees with the valuation established by the appraiser, each party shall within fifteen (15) days after the issuance of the appraiser's report, appoint one MAI appraiser with a minimum of ten (10) years of commercial real estate experience and notify each party of the appraiser's name and business address.  Within thirty (30) days after being appointed as an appraiser by a party, such appraiser shall determine the Fair Option Price of the Membership Interest in writing and submit its report to all parties.

The Fair Option Price shall be determined by comparing all three appraisers' valuations and disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Option Price.  Each party shall pay for the services of the appraiser selected by it, and one half of all other costs relating to the determination of Fair Option Price.  The Fair Option Price as so determined shall be payable in cash.

8.9     Except as expressly permitted under Sections 8.2 and 8.3, a prospective transferee (other than an existing Member) of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member.  Any such Assignee shall be entitled only to receive allocations and distributions under this Agreement with respect to such Membership Interest and shall have no right to Vote or exercise any rights of a Member until such Assignee has been admitted as a

26

Substituted Member.  Until the Assignee becomes a Substituted Member, the Assigning Member will continue to be a Member and to have the power to exercise any rights and powers of a Member under this Agreement, including the right to Vote in proportion to the Percentage Interest that the Assigning Member would have had in the event that the assignment had not been made.

8.10    Any Person admitted to the Company as a Substituted Member shall be subject to all the provisions of this Agreement that apply to the Member from whom the Membership Interest was assigned, provided that the Assigning Member shall not be released from liabilities as a Member solely as a result of the assignment, both with respect to obligations to the Company and to third parties, incurred prior to the assignment.

8.11    The initial sale of Membership Interests in the Company to the Initial Members has not been qualified or registered under the securities laws of any state or registered under the Securities Act of 1933, in reliance upon exemptions from the registration provisions of those laws. Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred unless registered or qualified under applicable state and federal securities law unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required.  The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IX:

## DISSOLUTION AND WINDING UP

9.1    The Company shall be dissolved upon the first to occur of the following events:

(a)    The written agreement of a Majority of Members to dissolve the Company.

(b)    The sale or other disposition of substantially all of the Company's assets.

(c)    Entry of a decree of judicial dissolution.

9.2    On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company.  The Manager(s) who have not wrongfully dissolved the Company or, if there is no such Manager, the Members, shall wind up the affairs of the Company.  The delegates winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company.  After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a)    To pay the expenses of liquidation.

(b)    To the establishment of reasonable reserves by the delegate for contingent liabilities or obligations of the Company. Upon the delegate's determination that such reserves are no longer necessary, said reserves shall be distributed as provided in this Section 9.2.

(c)    To repay outstanding loans from Members. If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that the Member's loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members,

including all interest accrued and unpaid thereon. Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

(d)     Among the Members as provided in Section 4.12.

9.3     Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of each Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

# ARTICLE X:

# INDEMNIFICATION AND ARBITRATION

10.1     None of any Member, any Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them shall be liable, responsible or accountable in damages or otherwise to the Company, any third party or to any other Indemnified Party (as defined below) for any act or omission performed or omitted to be performed by any of them to the extent the Person performing such act or responsible for such omission reasonably believes such act or omission was within the scope of the authority conferred upon such Person (or its Affiliates) by this Agreement, except for fraud, willful misconduct or material breach of this Agreement. In addition, no Member shall have any personal liability for any guaranty provided by the Company, Urban Commons, Taylor Woods or Howard Wu. In any threatened, pending, or completed action, suit or proceeding against a Member, a Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them (collectively, "Indemnified Parties", and each individually, an "Indemnified Party") relating to Company business or the furtherance thereof by an Indemnified Party, including, but not limited to, guarantying any repayment or completion obligations of the Company, each Indemnified Party shall be fully protected and indemnified and held harmless by the Company against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs of investigation, fines, judgments and amounts paid in settlement, actually incurred by such Indemnified Party by virtue of its status as an Indemnified Party (collectively "Liabilities"), other than Liabilities resulting from the fraud, willful misconduct or material breach of this Agreement of or by such Indemnified Party. The indemnification provided by this Section 10.1 shall be recoverable only out of the assets of the Company, and no Member or Manager shall have any personal liability (or obligation to contribute capital to the Company) on account of the Company's indemnification.

10.2     This Agreement and the rights and obligations of the parties hereto shall be governed by the laws of the State of California. Any controversy, dispute, or claim of any nature arising out of, in connection with, or in relation to the interpretation, performance, enforcement or breach of this Agreement, including any claim based on contract, tort or statute (collectively, a "Dispute"), that cannot be resolved by the parties within thirty (30) days shall first be submitted to mediation between the parties. In the event that such mediation does not resolve the Dispute within ten (10) business days, the Dispute shall be resolved at the written request of any party to this Agreement by binding arbitration using applicable arbitration procedures of JAMS located in Los Angeles County, California. The parties shall attempt to designate one arbitrator from JAMS. If they are unable to do so within thirty (30) days after written demand therefor, then JAMS shall designate an arbitrator. The arbitration shall be final and binding, and enforceable in any court of competent jurisdiction. The arbitrator shall award attorneys' fees and costs to the prevailing party

and charge the cost of arbitration to the party which is not the prevailing party. Notwithstanding anything to the contrary contained herein, this Section 10.2 shall not prevent any party from seeking and obtaining equitable relief on a temporary or permanent basis, including, without limitation, a temporary restraining order, a preliminary or permanent injunction or similar equitable relief, from a court of competent jurisdiction located in the State of California (to which all parties hereto consent to venue and jurisdiction) by instituting a legal action or other court proceeding in order to protect or enforce the rights of such party under this Agreement or to prevent irreparable harm and injury. The court's jurisdiction over any such equitable matter, however, shall be expressly limited only to the temporary, preliminary, or permanent equitable relief sought; all other claims initiated under this Agreement between the parties hereto shall be determined through final and binding arbitration in accordance with the terms of this Section 10.2.

## ARTICLE XI:

## INVESTMENT REPRESENTATIONS

Each Member represents and warrants to, and agrees with, the other Members and the Company as follows:

11.1 (a) The Member has a pre-existing personal or business relationship with the Company or one or more of its officers or control Persons, or (b) by reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in a Membership Interest and of protecting the Member's own interests in connection with this investment.

11.2 The Member understands that acquiring a Membership Interest involves a number of significant risk factors, including but not limited to, (a) the Company is newly formed and has no operating history or prior earnings to evaluate, (b) the Company will be subject to the risks generally incident to the ownership of real estate, (c) the Company will encounter considerable competition in operating its real estate, (d) all decisions with respect to management of the Company will be made exclusively by the Manager(s), (e) the Company's investment objectives must be considered speculative and there is no assurance the Company will achieve them, and (f) the Manager(s) may be subject to various conflicts of interest in the management of the Company. The Member has evaluated all such risks, and agrees to accept such risks.

11.3 The Member is purchasing the Membership Interest for the Member's own account and not with a view to or for sale in connection with any distribution of the Membership Interests.

## ARTICLE XII:

## ATTORNEY-IN-FACT AND AGENT

12.1 Each Member, by execution of this Agreement, irrevocably constitutes and appoints each Manager and any of them acting alone as such Member's true and lawful attorney-in-fact and agent, with full power and authority in such Member's name, place, and stead to execute, acknowledge, and deliver, and to file or record in any appropriate public office: (a) any certificate or other instrument that may be necessary, desirable, or appropriate to qualify the Company as a limited liability company or to transact business as such in any jurisdiction in which the Company conducts business; (b) any amendment to the Company's Certificate of Formation

29

or to any certificate or other instrument that may be necessary, desirable, or appropriate to reflect an amendment approved by the Members in accordance with the provisions of this Agreement; (c) any certificates or instruments that may be necessary, desirable, or appropriate to reflect the dissolution and winding up of the Company; and (d) any certificates necessary to comply with the provisions of this Agreement. This power of attorney will be deemed to be coupled with an interest and will survive the Transfer of the Member's Economic Interest. Notwithstanding the existence of this power of attorney, each Member agrees to join in the execution, acknowledgment, and delivery of the instruments referred to above if requested to do so by a Manager. This power of attorney is a limited power of attorney and does not authorize any Manager to act on behalf of a Member except as described in this Article XII.

## ARTICLE XIII:

## GENERAL PROVISIONS

13.1    This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement. This Agreement replaces and supersedes all prior written and oral agreements and statements by and among the Members and Manager(s) or any of them.  No representation, statement, condition, or warranty not contained in this Agreement will be binding on the Members or have any force or effect whatsoever.

13.2    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.3    If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

13.4    This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

13.5    Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

13.6    The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

13.7    Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

13.8    Except as provided in this Agreement, no provision of this Agreement shall be construed to appoint a Member, in the Member's capacity as such, the agent of any other Member.

13.9    Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

13.10    The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

13.11    This Agreement may not be modified or amended in any manner unless in writing and signed by a Majority of Members; provided, however, that no amendment or modification to this Agreement may be made without the approval of each Member adversely affected thereby if such amendment would: (i) appoint such Member as a Manager of the Company, (ii) modify the limited liability of a Member, or (iii) alter the interest of a Member in Profits, Losses, other items of income, gain, loss and deduction, or any Company distributions.    Notwithstanding the foregoing, the Manager(s) may amend from time to time Exhibit "A" hereto to reflect the Members and their respective Percentage Interests.

13.12    Time is of the essence of every provision of this Agreement that specifies a time for performance.

13.13    This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person shall have or acquire any right by virtue of this Agreement.

13.14    No Member or Assignee of an Economic Interest has any interest in specific Property or other assets of the Company.    Without limiting the foregoing, each Member and Assignee irrevocably waives any right that such Member or Assignee may have to maintain any action for partition with respect to the Property or other assets of the Company.

### *[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

**MANAGER AND MEMBER:**

**URBAN COMMONS, LLC,**
a Delaware limited liability company

By: _____
Taylor Woods, Member

By: _____
Howard Wu, Member

## EXHIBIT "A"

### INITIAL MEMBERS, POSITION AND PERCENTAGE INTERESTS
### As of October 15, 2019

| NAME | PERCENTAGE INTEREST |
|---|---|
| █████████████ | 0.40% |
| █████████████ | 2.50% |
| ███████████████ | 0.50% |
| █████████████ | 1.00% |
| █████████████ | 0.42% |
| ████████████ | 1.70% |
| Michael Chiang | 3.00% |
| ████████ | 0.48% |
| ████████████████ | 0.50% |
| ██████████████ | 0.42% |
| █████████ | 1.00% |
| █████████████ | 1.00% |
| ██████ | 1.00% |
| ██████████ | 0.42% |
| ██████████ | 1.67% |
| ████████ | 20.83% |
| █████████ | 1.00% |
| ████ | 1.67% |
| ███████████ | 0.30% |
| ███████████ | 4.45% |
| Urban Commons, LLC | 55.76% |
| **Total** | **100.00%** |

# EXHIBIT "B"

## INTERNAL RATE OF RETURN EXPLANATION AND SAMPLE CALCULATION

XIRR

Returns the internal rate of return for a schedule of cash flows that is not necessarily periodic.  To calculate the internal rate of return for a series of periodic cash flows, use the IRR function.

XIRR (Values, Dates, Guess)

*        Values is a series of cash flows that corresponds to a schedule of payments in dates.  The first payment is optional and corresponds to a cost or payment that occurs at the beginning of the investment.  If the first value is a cost or payment, it must be a negative value.  All succeeding payments are discounted based on a 365-day year.  The series of values must contain at least one positive and one negative value.

*        Dates is a schedule of payment dates that corresponds to the cash flow payments.  The first payment date indicates the beginning of the schedule of payments.  All other dates must be later than this date, but they may occur in any order.

*        Guess is a number that you guess is close to the result of XIRR.

REMARKS

*        Microsoft Excel stores dates as sequential serial numbers so that it can perform calculations on them.  Excel stores January 1, 1900, as serial number 1 if your workbook uses the 1900 date system.  If your workbook uses the 1904 date system, Excel stores January 1, 1904, as serial number 0 (January 2, 1904, is serial number 1).  For example, in the 1900 date system, Excel stores January 1, 1998, as serial number 35796 because it is 35,795 days after January 1, 1900.

*        Numbers in dates are truncated to integers.

*        XIRR expects at least one positive cash flow and one negative cash flow; otherwise, XIRR returns the #NUM! error value.

*        If any number in dates is not a valid date, XIRR returns the #NUM! error value.

*        If any number in dates precedes the starting date, XIRR returns the #NUM! error value.

*        If values and dates contain a different number of values, XIRR returns the #NUM! error value.

*        In most cases you do not need to provide guess for the XIRR calculation.  If omitted, guess is assumed to be 0.1 (10 percent).

*        XIRR is closely related to XNPV, the net present value function. The rate of return calculated by XIRR is the interest rate corresponding to XNPV = 0.

*        Excel uses an iterative technique for calculating XIRR.  Using a changing rate (starting with guess), XIRR cycles through the calculation until the result is accurate within 0.000001 percent. If XIRR can't find a result that works after 100 tries, the #NUM! error value is returned. The rate is changed until:

<<...OLE_Obj...>>  <<...OLE_Obj...>>

where:

di = the ith, or last, payment date.
d1 = the 0th payment date.
Pi = the ith, or last, payment.

EXAMPLE

Consider an investment that requires a $10,000 cash payment on January 1, 1998, and returns $2,750 on March 1, 1998, $4,250 on October 30, 1998, $3,250 on February 15, 1999, and $2,750 on April 1, 1999. The internal rate of return (in the 1900 date system) is:

> XIRR({-10000,2750,4250,3250,2750},
> {"1/1/1998","3/1/1998","10/30/1998","2/15/1999","4/1/1999"},0.1) equals:

> 0.374859 or 37.4859 percent

The IRR calculations under Sections 4.11 and 4.12 shall be determined at the time of each distribution and shall be calculated based on the total distributions made to the Members through the date of such distribution. Once the IRR is calculated on the aggregate Capital Contributions made by the Members, the Available Cash Flow and revenues or proceeds from a Capital Event or the dissolution of the Company shall be divided between Urban Commons and the Members based on the applicable percentages in Sections 4.11 and 4.12 and appropriate adjustments shall be made to such distributions so that the total distributions to Urban Commons and the Members shall be equal to the required percentages. Accordingly, for purposes of example, if (a) $100,000 is available to be distributed to the Members and (b) such amount plus any previous distributions to the Members equals a 30% IRR on the aggregate Capital Contributions made by the Members, then Urban Commons shall be entitled to 20% of the distribution plus such additional portion of the distribution as may be necessary in order for Urban Commons to receive 20% of the total amounts distributed under Sections 4.11 and 4.12 and the remaining share of such distribution shall be distributed to the Members based on the Members' Capital Percentage Interests pro rata. At the time of each distribution to the Members of Available Cash Flow and revenues or proceeds from a Capital Event or the dissolution of the Company, the Manager(s) shall adjust as necessary the distributions to be made to Urban Commons and the Members in connection with such distribution in order to satisfy the distribution percentages in Sections 4.11 and 4.12.

EXHIBIT B

# EXHIBIT C

# INVESTMENT AGREEMENT

**THIS INVESTMENT AGREEMENT** (this "**Agreement**") is made as of ___July 8th___, 2020 (the "**Effective Date**"), by and between Urban Commons, LLC, the manager (the "**Manager**") of Urban Commons 6th Ave Seattle, LLC, a Delaware limited liability company (the "**Company**") at 10250 Constellation Blvd., Suite 1750, Los Angeles, California 90067, and ___Michael Chiang___ (the "**Member**") at ___████████████████___ (Member Address), with reference to the following facts:

    A. Member has invested $ ___150,000.00___ USD in Company (the "**Investment Capital**") in accordance with the terms and conditions in Company's Subscription Agreement.

    B. Member has entered into Company's Operating Agreement dated December 16, 2019 as a member of Company (the "**Operating Agreement**").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **GUARANTEED PREFERRED RETURN**
   a. Member shall receive a six percent (6%) guaranteed preferred return per annum on Investment Capital ("**Preferred Return**"), to be paid each Calendar Quarter at the rate of 1.5% each Calendar Quarter.
   b. "Preferred Return" means an amount calculated like interest and accrued on the balance standing from time to time in such Member's Investment Capital account at a simple interest rate equal to six percent (6%) per annum, non-compounded.
   c. "Calendar Quarter" shall mean each period of three (3) consecutive calendar months commencing on the first day of January, April, July and October of each Calendar Year.
   d. Net profits of Company that exceed 6% per annum will be distributed to the members of the Company on a pro rata basis in accordance to the percentage of ownership interest as set forth in Exhibit A of the Operating Agreement.
   e. For accounting and tax purposes, net profits or net losses shall be determined on an annual basis.

2. **TERM AND TERMINATION**
   a. This Agreement shall be effective and binding upon the parties as of the Effective Date.
   b. This Agreement will terminate in the event one of the following occurs:
      i. Written consent of Member
      ii. Member is no longer a member of Company

3. **MISCELLANEOUS**
   a. This Agreement may be amended or modified only by a written agreement signed by all of the parties.
   b. No party shall be deemed to have waived any provision of this Agreement or the exercise of any rights held under this Agreement unless such waiver is made expressly and in writing. Waiver by any party of a breach or violation of any provision of this Agreement

shall not constitute a waiver of any other subsequent breach or violation.

c. No party hereto shall have the right to assign its rights or delegates its duties hereunder without the written consent of the other parties, which consent shall not be unreasonably withheld.

d. If any provision of this Agreement is held to be invalid, illegal or unenforceable in whole or in part, the remaining provisions shall not be affected and shall continue to be valid, legal and enforceable as though the invalid, illegal or unenforceable parts had not been included in this Agreement.

e. This Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

f. The section headings herein are for reference purposes only and shall not otherwise affect the meaning, construction or interpretation of any provision in this Agreement.

g. The terms of this Agreement shall be governed by and construed in accordance with the laws of the State of California.

h. Any dispute arising from this Agreement shall be resolved through binding arbitration conducted in accordance with the rules of the American Arbitration Association.

i. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together, shall constitute one and the same document.

j. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together, shall constitute one and the same document.

[Remainder of page intentionally left blank.]

DocuSign Envelope ID: A5639B23-9374-4EFC-A397-8FEC1A7E25E

Case 22-22222-abc-DEF Doc 34-2 Filed 09/21/22 Entered 09/21/22 14:28:03 Desc
Exhibit Combined Documents to Page 69 Page 50 of 72

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

MEMBER:

DocuSigned by:

BY: *Michael Chiang* _____

4B40865DBB1B4C1...

NAME: Michael Chiang _____

TITLE: _____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

DocuSign Envelope ID: A5689B23-9374-4EFC-A397-8FEC1A75267E

Case 22-20715-EPK    Doc 3402    Filed 09/21/22    Entered 09/21/22 14:28:37    Desc
Exhibit Combined Exhibits to SAC    Page 70 of 91 of 72

MANAGER:

URBAN COMMONS LLC, a Delaware
limited liability company



BY: _____

NAME: _Taylor Woods_____

TITLE: Managing Member

**MEMBERS:**

Printed Name of Member

Signature of Member

Michael Chiang

DocuSigned by:

*Michael Chiang*

4B40865DBB1B4C1...

Printed Name(s) and Title(s) or
Capacity(ies) of any Officer(s)
Partner(s) or Agent(s) Acting on
Behalf of Member

Signature(s) of Any Officer(s),
Partner(s) or Agent(s) Acting
on Behalf of Member

By:_____

By:_____

Title:_____

DocuSign Envelope ID: A5690B23-9374-4EFC-A397-8FEC1A75F57E

Case 22-22222-app30107-11-ER   Doc 342-2   Filed 09/21/22   Entered 10/09/21/22 14:28:03 17   Desc
Exhibit Combined Exhibits to Page 72 Page 53 of 72

**URBAN COMMONS 6TH AVE SEATTLE, LLC**
**MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT**

TO:     Urban Commons 6th Ave Seattle, LLC

I hereby irrevocably offer to purchase a membership interest (the "Interest") in Urban Commons 6th Ave Seattle, LLC, a Delaware limited liability company (the "Company"), for a purchase price of $ 150,000.00 , upon the terms and conditions described below. The membership interest shall be calculated using my capital contribution divided by the total capital contribution of $30,000,000, which shall result in an ownership percentage of 0.5 %. I agree to pay the balance of the purchase price for the Interest to the Company not later than July 8, 2020. I will deliver to the Company the purchase price for the Interest in the manner set forth in Section 14 below.

I understand that up to 100% of the membership qualified purchasers may purchase interests in the Company in this offering. I further understand that the Company may terminate this offering at any time, that the Company, in its discretion, may accept or reject my subscription, provided that notification of such rejection must be given to me within 15 days after this Agreement, properly completed and signed by me, and full payment of the purchase price for the Interest is delivered to the Company, and that, if there is such rejection notification, the purchase price will be promptly returned to me without interest. The Company anticipates completing this offering by July 10, 2020.

I understand the Company will not use or apply the purchase price until the Company has raised the necessary funds from this offering. The funds raised from the offerings will be used to invest in an entity which shall acquire, own, operate, and eventually sell that certain property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington (the "Property"). I further understand that (i) the purchase price will be deposited into an interest-bearing secure bank account and (ii) all interest earned on such account will be used by the Company to pay all cost and expenses (including, but not limited to, all legal, accounting and management costs and expenses) incurred in connection with this offering and the formation of the Company. The initial membership interests of the members will be reflected in the Operating Agreement for the Company. If this subscription is terminated, all funds raised by the Company will be returned to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses.

I understand the Company is obtaining acquisition loans in an approximate aggregate amount of approximately $70,000,000 in order to acquire and refurbish the Property but that the terms for such financing have not yet been finalized.

I understand that the terms of the Interest and related agreements are set forth in the Operating Agreement for the Company, a copy of which has been or will be provided subsequent to me. The Company's acceptance of my subscription will be conditioned on my entering into the Operating Agreement and agreeing to be bound by all of its terms. I understand that the Operating Agreement for the Company will name Urban Commons, LLC as the sole manager of the Company (the "Manager") with exclusive authority and control over all Company decisions in entering into and managing real estate investments. The Operating Agreement will provide that each investor's capital will be returned at the time of a capital event(s) and prior to any profits from such capital event(s) being distributed to the members.

I understand that the purchase of the Interest involves certain risks, including, but not limited to, the risks identified on the **Schedule of Investment Risks** attached to this Agreement. I have carefully read and considered these risks before making this offer to purchase the Interest.

In connection with my subscription for and purchase of the Interest, I hereby represent and warrant to the Company and agree as follows:

1.      I am acquiring the Interest for my own account for investment and not with a view to or for sale in connection with any distribution of the Interest.

2.      In making this investment, I am relying upon my own investigation and analysis and have determined that the Interest is a suitable investment for me. The Company has made available to me information, and the opportunity to question its representatives, concerning the terms of this offering and the proposed investment of the Company in various real investments. I have been furnished with such information as I have requested. It has never been guaranteed or warranted by the Company, or any person connected with or acting on the Company's behalf, that I will be able to sell or liquidate the Interest in any specified period of time or that there will be any particular profit to be realized as a result of this investment. I have adequate means to provide for my current and expected financial needs and reasonable contingencies, can bear the economic risks (including a complete loss of the purchase price) associated with my purchase of the Interest and have no need for liquidity in this investment.

3.      The Company has advised me that the Interest is not being registered under the Securities Act of 1933, as amended (the "<u>1933 Act</u>"), in reliance upon the exemption from the registration requirements provided by Section 4(2), Rule 506 of Regulation D and/or Regulation S under the 1933 Act, and are not being qualified or registered under any state securities laws in reliance upon applicable exemptions from the qualification and registration requirements.  I understand that no federal or state agency has made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Interest.  I understand that the Company is relying in part on my representations set forth in this Agreement for purposes of claiming such exemptions.  I understand the Company is under no obligation to register the Interest on my behalf.

4.      I agree that I, and any transferees of the Interest, shall be bound by the restrictions on transfers of the Interest which are described in this paragraph or are otherwise applicable under federal or state securities laws.  I also understand that any certificate representing the Interest will bear a legend substantially in the following form, and any legend appropriate to comply with applicable state securities laws, which I agree to abide by:

"THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS DULY QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, BASED ON AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED."

I agree that stop transfer instructions prohibiting transfers of the Interest may be filed in the Company's records or issued to the Company's transfer agent as a means of preventing the sale or disposition of the Interest in violation of the restrictions and legends set forth in this paragraph above and that any transfer of the Interest or any portion thereof causing such a violation shall be void.

5.      The offer to sell the Interest was directly communicated to me by direct communication with the Company's director(s), officer(s) or manager(s), and I was not presented with or solicited by any leaflet, public promotional meeting, television advertisement or other form of general advertising.  (FILL IN THE FOLLOWING)      I am a citizen of _____United States_____ or, if I am an entity, I was formed and exist under the laws of _____.

6.      I have a substantial preexisting personal or business relationship with the Company's management personnel and/or, by reason of my business or financial experience, or the business or financial experience of my management if I am an entity, am capable of evaluating the merits and risks of my purchase of the Interest and have the capacity to protect my interests in connection with this investment.

7.      I am an "Accredited Investor," as defined in Rule 501(a) of Regulation D under the 1933 Act, as follows (CHECK EACH APPLICABLE BOX--AT LEAST ONE MUST BE APPLICABLE AND CHECKED):

[ X ]      (a)      I am a natural person whose individual net worth, or joint net worth with my spouse, including the estimated net fair market value of my principal residence, presently exceeds $1,000,000; and/or

[ ]      (b)      I am a natural person who had individual income, without that of my spouse, in excess of $200,000 in each of the two most recent years and reasonably expects to have income in excess of $200,000 in the current year; and/or

[ ]      (c)      I am a natural person who had joint income with my spouse in excess of $300,000 in each of the two most recent years and reasonably expects to have such joint income in excess of $300,000 in the current year; and/or

[ ]      (d)      I am (circle which one) a corporation, partnership, limited liability company, or organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000; and/or

[ ]      (e)      I am a trust, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000 whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this prospective investment); and/or

[ ]      (f)      I am any of the following (CIRCLE WHICH ONE):  a bank (as defined in Section 3(a)(2) of the 1933 Act), or a savings and loan association or other institution (as defined in Section 3(a)(5) of the 1933 Act), whether acting in an individual or fiduciary capacity; or a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; or an insurance company (as defined in Section 2(13) of the 1933 Act; or an investment company registered under the Investment Company Act of 1940; or a business development company (as defined in Section 2(a)(48) of the Investment Company Act of 1940; or a Small Business Investment Company licensed by the U.S. Small Business

DocuSign Envelope ID: A5699B23-9374-4EEC-A397-8EEC4A75E67E

Case 22-22422-app 30107-11 ER — Doc 34-2 — Filed 09/21/22 — Entered 10/21/22 16:28:37 — Desc
Exhibit Combined Exhibits to Page 74 Page 55 of 72

Administration under Section 301(c) or (d) of the Small Business Administration Act of 1958; or a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of such Act), which is either a bank, savings and loan association, insurance company or registered investment adviser or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; and/or

[ ]     (g)     I am an entity in which all of the equity owners are Accredited Investors.

8.     (CHECK THIS BOX IF APPLICABLE:     [ ])  The offer to sell the Interest was not made to me by the Company or its agents while I was in, and I have made this offer to buy the Interest and signed this Agreement when I have been outside of, the United States of America (which for purposes of this Agreement includes all of its states, territories and possessions and the District of Columbia).

9.     The information set forth in this Agreement is correct with respect to me as of the date of my execution of this Agreement.  I will promptly notify the Company of any change in such information occurring before I am notified of the acceptance of my subscription by the Company and will provide any further supplementary information, which is requested by the Company.

10.     I hereby agree to indemnify the Company and its officers, directors, managers and agents against, and hold such parties harmless from, any and all liabilities, damages, costs or expenses, including, without limitation, those arising under federal or state securities laws, incurred on account of or arising out of: (a) any inaccuracy in my representations and covenants set forth herein; or (b) the disposition of any portion of the Interest which I will receive, contrary to my foregoing representations and covenants.

11.     If a corporation, partnership, trust, limited liability company or other form of business entity, I am authorized and otherwise duly qualified to purchase and hold the Interest and have not been formed for the specific purpose of making an investment in the Company.  If an undersigned individual is executing this Agreement, as well as all other related documents, on behalf of any entity, such individual represents that he or she is duly authorized to execute all such documents on behalf of that entity.  If an individual, I am under no legal disability with respect to entering into this Agreement or purchasing the Interest.

12.     At the Company's request, I will promptly execute such other instruments or documents as may be reasonably required in connection with my purchase of the Interest.  Whenever the context hereof so requires, use of either the masculine, feminine or neuter shall include the masculine, feminine and neuter, and use of the singular or the plural form shall include the singular and plural.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of laws provisions.  In any dispute or legal proceeding relating to the enforcement of rights under this Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and costs.  This Agreement constitutes the entire agreement between me and the Company, and supersedes any prior or contemporaneous representations, warranties, understandings or agreements, with respect to the subject matter of this Agreement.  Neither this Agreement nor any provision hereof may be amended, waived or canceled except by an instrument in writing signed by the party against whom any such amendment, waiver or cancellation is sought.  Any provision of this Agreement which is invalid or unenforceable under applicable laws shall be deemed inoperative to the extent it conflicts with such laws, but shall not affect the enforceability of other provisions of this Agreement.  No waiver of any of the provisions of this Agreement shall be deemed a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.

13.     This Agreement shall be binding upon my heirs, executors, administrators, successors and assigns. However, my rights and obligations to purchase the Interest under this Agreement may not be assigned or transferred to any other person without the Company's prior written consent and any assignment or transfer in violation of this paragraph shall be void.

14.     The purchase price for the Interest will be paid in the form of a (wire, check, transfer, etc): _Wire_____.

DocuSign Envelope ID: A5630B23-9354-4EFC-A397-8FEC1A7525E

DATED: _____7/8/20_____


Printed Name of Purchaser                    Signature of Purchaser

_____Michael Chiang_____                     DocuSigned by:

                                             *Michael Chiang*
                                             ─────────────────────────
                                             4B40865DBB1B4C1...

Printed Name(s) and Title(s) or              Signature(s) of Any Officer(s),
Capacity(ies) of any Officer(s)              Partner(s) or Agent(s) Acting
Partner(s) or Agent(s) Acting on             on Behalf of Purchaser if an entity:
Behalf of Purchaser (if an entity):


Name: _____                  Signature: _____

Title: _____

### ADDITIONAL INFORMATION

[COMPLETE EACH ITEM. MODIFY AS APPROPRIATE IF THERE ARE TWO OR MORE PURCHASERS. ADD ADDITIONAL SHEETS IF NECESSARY TO COMPLETE ANY OF THE ITEMS.]

1.    Give the exact name(s) in which title to the Interest is to be taken:

    Michael Chiang

Indicate the type of ownership [check one]:

[x]  Individual ownership          [ ]  Joint Tenancy
     (One signature required)           (Both parties must sign)

[ ]  Trust (Include             [ ]  Community Property
     name of trustee(s) and date       (Spouse or spouses named
     trust was established)         as record holder(s)
                                      must sign)

[ ]  Partnership (Include         [ ]  Tenants in Common
     copy of the statement         (Both parties must sign)
     of partnership or the
     partnership agreement
     or certificate authorizing
     signature)

[ ]  Corporation (Include        [ ]  Other:_____
     certified corporate
     resolution authorizing
     purchase and signature)

2.    If the purchaser is other than an individual purchasing for his or her own account (a corporation, trustee, partnership, custodian, estate, etc.), indicate the nature of the purchaser and the capacity of any person(s) signing above on behalf of the purchaser:

3.    Residence address of purchaser or principal business address (if an entity):

4.    Mailing address (if different than residence address) to be used for notices from the Company:

5.    Telephone numbers:

    Business:     (_____) _____

    Residence:    ███████████████

    Facsimile:    (_____) _____

6.    Tax ID Number (Social Security Number if an individual):_███████_____

7.    E-Mail Address:_████████_____

DocuSign Envelope ID: A5689B23-9374-4EFC-A397-8EFC1A7E267E

Case 22-22222-abc-11-ER Doc 3462 Filed 09/21/22 Entered 09/21/22 14:28:37 Desc
Exhibit Combined Exhibits to Page 77 Page 58 of 72

**ACCEPTANCE BY THE COMPANY**

URBAN COMMONS 6TH AVE SEATTLE, LLC hereby accepts the foregoing agreement and agrees to be bound by its provisions.

DATED:  _7/8/20_

URBAN COMMONS 6TH AVE SEATTLE, LLC,
a California limited liability company

By:      Urban Commons, LLC,
         a Delaware limited liability company,
         Its Manager

By: _____
          Signature

Taylor Woods
_____
Printed Name

Managing member
_____
Title

6

# EXHIBIT D

**MEMBERS:**

Printed Name of Member               Signature of Member

_____       _____
Agnes Chin                           *Agnes Chin*
                                     D4FFE9C97AEE4AF...

Printed Name(s) and Title(s) or      Signature(s) of Any Officer(s),
Capacity(ies) of any Officer(s)      Partner(s) or Agent(s) Acting
Partner(s) or Agent(s) Acting on     on Behalf of Member
Behalf of Member


By:_____    By:_____

Title:_____

**URBAN COMMONS 6TH AVE SEATTLE, LLC**
**MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT**

TO:     Urban Commons 6th Ave Seattle, LLC

I hereby irrevocably offer to purchase a membership interest (the "Interest") in Urban Commons 6th Ave Seattle, LLC, a Delaware limited liability company (the "Company"), for a purchase price of $ _150,000.00_____, upon the terms and conditions described below.  The membership interest shall be calculated using my capital contribution divided by the total capital contribution of $30,000,000, which shall result in an ownership percentage of _0.5_____%.  I agree to pay the balance of the purchase price for the Interest to the Company not later than July 8, 2020.  I will deliver to the Company the purchase price for the Interest in the manner set forth in Section 14 below.

I understand that up to 100% of the membership qualified purchasers may purchase interests in the Company in this offering. I further understand that the Company may terminate this offering at any time, that the Company, in its discretion, may accept or reject my subscription, provided that notification of such rejection must be given to me within 15 days after this Agreement, properly completed and signed by me, and full payment of the purchase price for the Interest is delivered to the Company, and that, if there is such rejection notification, the purchase price will be promptly returned to me without interest.  The Company anticipates completing this offering by July 10, 2020.

I understand the Company will not use or apply the purchase price until the Company has raised the necessary funds from this offering.  The funds raised from the offerings will be used to invest in an entity which shall acquire, own, operate, and eventually sell that certain property known as the Hilton Seattle, located at 1301 6th Avenue, Seattle, Washington (the "Property").  I further understand that (i) the purchase price will be deposited into an interest-bearing secure bank account and (ii) all interest earned on such account will be used by the Company to pay all cost and expenses (including, but not limited to, all legal, accounting and management costs and expenses) incurred in connection with this offering and the formation of the Company.  The initial membership interests of the members will be reflected in the Operating Agreement for the Company.  If this subscription is terminated, all funds raised by the Company will be returned to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses.

I understand the Company is obtaining acquisition loans in an approximate aggregate amount of approximately $70,000,000 in order to acquire and refurbish the Property but that the terms for such financing have not yet been finalized.

I understand that the terms of the Interest and related agreements are set forth in the Operating Agreement for the Company, a copy of which has been or will be provided subsequent to me.  The Company's acceptance of my subscription will be conditioned on my entering into the Operating Agreement and agreeing to be bound by all of its terms.  I understand that the Operating Agreement for the Company will name Urban Commons, LLC as the sole manager of the Company (the "Manager") with exclusive authority and control over all Company decisions in entering into and managing real estate investments.  The Operating Agreement will provide that each investor's capital will be returned at the time of a capital event(s) and prior to any profits from such capital event(s) being distributed to the members.

I understand that the purchase of the Interest involves certain risks, including, but not limited to, the risks identified on the **Schedule of Investment Risks** attached to this Agreement.  I have carefully read and considered these risks before making this offer to purchase the Interest.

In connection with my subscription for and purchase of the Interest, I hereby represent and warrant to the Company and agree as follows:

1.      I am acquiring the Interest for my own account for investment and not with a view to or for sale in connection with any distribution of the Interest.

2.      In making this investment, I am relying upon my own investigation and analysis and have determined that the Interest is a suitable investment for me.  The Company has made available to me information, and the opportunity to question its representatives, concerning the terms of this offering and the proposed investment of the Company in various real investments.  I have been furnished with such information as I have requested.  It has never been guaranteed or warranted by the Company, or any person connected with or acting on the Company's behalf, that I will be able to sell or liquidate the Interest in any specified period of time or that there will be any particular profit to be realized as a result of this investment.  I have adequate means to provide for my current and expected financial needs and reasonable contingencies, can bear the economic risks (including a complete loss of the purchase price) associated with my purchase of the Interest and have no need for liquidity in this investment.

1

3.      The Company has advised me that the Interest is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), in reliance upon the exemption from the registration requirements provided by Section 4(2), Rule 506 of Regulation D and/or Regulation S under the 1933 Act, and are not being qualified or registered under any state securities laws in reliance upon applicable exemptions from the qualification and registration requirements.  I understand that no federal or state agency has made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Interest.  I understand that the Company is relying in part on my representations set forth in this Agreement for purposes of claiming such exemptions.  I understand the Company is under no obligation to register the Interest on my behalf.

4.      I agree that I, and any transferees of the Interest, shall be bound by the restrictions on transfers of the Interest which are described in this paragraph or are otherwise applicable under federal or state securities laws.  I also understand that any certificate representing the Interest will bear a legend substantially in the following form, and any legend appropriate to comply with applicable state securities laws, which I agree to abide by:

"THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS DULY QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, BASED ON AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED."

I agree that stop transfer instructions prohibiting transfers of the Interest may be filed in the Company's records or issued to the Company's transfer agent as a means of preventing the sale or disposition of the Interest in violation of the restrictions and legends set forth in this paragraph above and that any transfer of the Interest or any portion thereof causing such a violation shall be void.

5.      The offer to sell the Interest was directly communicated to me by direct communication with the Company's director(s), officer(s) or manager(s), and I was not presented with or solicited by any leaflet, public promotional meeting, television advertisement or other form of general advertising.  (FILL IN THE FOLLOWING)    I am a citizen of _____United States_____ or, if I am an entity, I was formed and exist under the laws of _____.

6.      I have a substantial preexisting personal or business relationship with the Company's management personnel and/or, by reason of my business or financial experience, or the business or financial experience of my management if I am an entity, am capable of evaluating the merits and risks of my purchase of the Interest and have the capacity to protect my interests in connection with this investment.

7.      I am an "Accredited Investor," as defined in Rule 501(a) of Regulation D under the 1933 Act, as follows (CHECK EACH APPLICABLE BOX--AT LEAST ONE MUST BE APPLICABLE AND CHECKED):

[x]     (a)     I am a natural person whose individual net worth, or joint net worth with my spouse, including the estimated net fair market value of my principal residence, presently exceeds $1,000,000; and/or

[ ]     (b)     I am a natural person who had individual income, without that of my spouse, in excess of $200,000 in each of the two most recent years and reasonably expects to have income in excess of $200,000 in the current year; and/or

[ ]     (c)     I am a natural person who had joint income with my spouse in excess of $300,000 in each of the two most recent years and reasonably expects to have such joint income in excess of $300,000 in the current year; and/or

[ ]     (d)     I am (circle which one) a corporation, partnership, limited liability company, or organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000; and/or

[ ]     (e)     I am a trust, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000 whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this prospective investment); and/or

[ ]     (f)     I am any of the following (CIRCLE WHICH ONE):  a bank (as defined in Section 3(a)(2) of the 1933 Act), or a savings and loan association or other institution (as defined in Section 3(a)(5) of the 1933 Act), whether acting in an individual or fiduciary capacity; or a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; or an insurance company (as defined in Section 2(13) of the 1933 Act; or an investment company registered under the Investment Company Act of 1940; or a business development company (as defined in Section 2(a)(48) of the Investment Company Act of 1940; or a Small Business Investment Company licensed by the U.S. Small Business

DocuSign Envelope ID: 7391B5E5-7CC7-422F-A822-92AC94690A81

Case 22-20077-TPA Doc 342 Filed 09/21/22 Entered 09/21/22 14:28:07 Desc
Exhibit Combined Exhibits to PageC82 Page 63 of 72

Administration under Section 301(c) or (d) of the Small Business Administration Act of 1958; or a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of such Act), which is either a bank, savings and loan association, insurance company or registered investment adviser or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; and/or

[ ]     (g)     I am an entity in which all of the equity owners are Accredited Investors.

8.     (CHECK THIS BOX IF APPLICABLE:     [ ])  The offer to sell the Interest was not made to me by the Company or its agents while I was in, and I have made this offer to buy the Interest and signed this Agreement when I have been outside of, the United States of America (which for purposes of this Agreement includes all of its states, territories and possessions and the District of Columbia).

9.     The information set forth in this Agreement is correct with respect to me as of the date of my execution of this Agreement.  I will promptly notify the Company of any change in such information occurring before I am notified of the acceptance of my subscription by the Company and will provide any further supplementary information, which is requested by the Company.

10.     I hereby agree to indemnify the Company and its officers, directors, managers and agents against, and hold such parties harmless from, any and all liabilities, damages, costs or expenses, including, without limitation, those arising under federal or state securities laws, incurred on account of or arising out of: (a) any inaccuracy in my representations and covenants set forth herein; or (b) the disposition of any of portion of the Interest which I will receive, contrary to my foregoing representations and covenants.

11.     If a corporation, partnership, trust, limited liability company or other form of business entity, I am authorized and otherwise duly qualified to purchase and hold the Interest and have not been formed for the specific purpose of making an investment in the Company.  If an undersigned individual is executing this Agreement, as well as all other related documents, on behalf of any entity, such individual represents that he or she is duly authorized to execute all such documents on behalf of that entity.  If an individual, I am under no legal disability with respect to entering into this Agreement or purchasing the Interest.

12.     At the Company's request, I will promptly execute such other instruments or documents as may be reasonably required in connection with my purchase of the Interest.  Whenever the context hereof so requires, use of either the masculine, feminine or neuter shall include the masculine, feminine and neuter, and use of the singular or the plural form shall include the singular and plural.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of laws provisions.  In any dispute or legal proceeding relating to the enforcement of rights under this Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and costs.  This Agreement constitutes the entire agreement between me and the Company, and supersedes any prior or contemporaneous representations, warranties, understandings or agreements, with respect to the subject matter of this Agreement.  Neither this Agreement nor any provision hereof may be amended, waived or canceled except by an instrument in writing signed by the party against whom any such amendment, waiver or cancellation is sought.  Any provision of this Agreement which is invalid or unenforceable under applicable laws shall be deemed inoperative to the extent it conflicts with such laws, but shall not affect the enforceability of other provisions of this Agreement.  No waiver of any of the provisions of this Agreement shall be deemed a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.

13.     This Agreement shall be binding upon my heirs, executors, administrators, successors and assigns. However, my rights and obligations to purchase the Interest under this Agreement may not be assigned or transferred to any other person without the Company's prior written consent and any assignment or transfer in violation of this paragraph shall be void.

14.     The purchase price for the Interest will be paid in the form of a (wire, check, transfer, etc): ____Wire_____.

DocuSign Envelope ID: 7391B5E5-7CC7-422F-A832-92AC94690A81

DATED: 7/8/2020

Printed Name of Purchaser          Signature of Purchaser

_____Agnes Chin_____              *Agnes Chin*
                                   D4FFE9C97AEE4AF...

Printed Name(s) and Title(s) or      Signature(s) of Any Officer(s),
Capacity(ies) of any Officer(s)      Partner(s) or Agent(s) Acting
Partner(s) or Agent(s) Acting on     on Behalf of Purchaser if an entity:
Behalf of Purchaser (if an entity):


Name: _____      Signature: _____

Title: _____

DocuSign Envelope ID: 7391B5E5-7CC7-423E-A932-92AC94690A81

Case 22-22222 appeal 00-01171 ER Doc 3452 Filed 09/21/22 Entered 09/21/22 14:28:37 Desc
Exhibit Combined Exhibits to Sec 84 Page 65 of 72

## ADDITIONAL INFORMATION

[COMPLETE EACH ITEM. MODIFY AS APPROPRIATE IF THERE ARE TWO OR MORE PURCHASERS. ADD ADDITIONAL SHEETS IF NECESSARY TO COMPLETE ANY OF THE ITEMS.]

1.    Give the exact name(s) in which title to the Interest is to be taken:

Agnes Chin

Indicate the type of ownership [check one]:

[x]    Individual ownership      [ ]    Joint Tenancy
(One signature required)                   (Both parties must sign)

[ ]    Trust (Include                 [ ]    Community Property
name of trustee(s) and date              (Spouse or spouses named
trust was established)                   as record holder(s)
                                     must sign)

[ ]    Partnership (Include       [ ]    Tenants in Common
copy of the statement              (Both parties must sign)
of partnership or the
partnership agreement
or certificate authorizing
signature)

[ ]    Corporation (Include      [ ]    Other:_____
certified corporate
resolution authorizing
purchase and signature)

2.    If the purchaser is other than an individual purchasing for his or her own account (a corporation, trustee, partnership, custodian, estate, etc.), indicate the nature of the purchaser and the capacity of any person(s) signing above on behalf of the purchaser:

_____

_____

3.    Residence address of purchaser or principal business address (if an entity):

█████████████████████████████_____

4.    Mailing address (if different than residence address) to be used for notices from the Company:

_____

5.    Telephone numbers:

Business:    (____) _____

Residence:    ███████████████████

Facsimile:    (____) _____

6.    Tax ID Number (Social Security Number if an individual):____██████████_____

7.    E-Mail Address:_____███████████████_____

DocuSign Envelope ID: 7391B5E5-7CC7-422E-A932-92AC94690A81

Case 2:22-ap-01007-ER  Doc 34-2  Filed 09/21/22  Entered 09/21/22 14:38:37  Desc
Exhibit Combined Exhibits to SAC  Page 66 of 72

**ACCEPTANCE BY THE COMPANY**

URBAN COMMONS 6TH AVE SEATTLE, LLC hereby accepts the foregoing agreement and agrees to be bound by its provisions.

DATED:  July 8, 2020

URBAN COMMONS 6TH AVE SEATTLE, LLC,
a California limited liability company

By:     Urban Commons, LLC,
        a Delaware limited liability company,
        Its Manager

By: _____

Signature

Taylor Woods

Printed Name

Managing member

Title

# INVESTMENT AGREEMENT

**THIS INVESTMENT AGREEMENT** (this "**Agreement**") is made as of <u>July 8th</u>, 2020 (the "**Effective Date**"), by and between Urban Commons, LLC, the manager (the "**Manager**") of Urban Commons 6th Ave Seattle, LLC, a Delaware limited liability company (the "**Company**") at 10250 Constellation Blvd., Suite 1750, Los Angeles, California 90067, and <u>Agnes Chin</u> (the "**Member**") at _____, ____ (Member Address), with reference to the following facts:

    A. Member has invested $ <u>150,000.00</u> USD in Company (the "**Investment Capital**") in accordance with the terms and conditions in Company's Subscription Agreement.

    B. Member has entered into Company's Operating Agreement dated December 16, 2019 as a member of Company (the "**Operating Agreement**").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **GUARANTEED PREFERRED RETURN**
   a. Member shall receive a six percent (6%) guaranteed preferred return per annum on Investment Capital ("**Preferred Return**"), to be paid each Calendar Quarter at the rate of 1.5% each Calendar Quarter.
   b. "Preferred Return" means an amount calculated like interest and accrued on the balance standing from time to time in such Member's Investment Capital account at a simple interest rate equal to six percent (6%) per annum, non-compounded.
   c. "Calendar Quarter" shall mean each period of three (3) consecutive calendar months commencing on the first day of January, April, July and October of each Calendar Year.
   d. Net profits of Company that exceed 6% per annum will be distributed to the members of the Company on a pro rata basis in accordance to the percentage of ownership interest as set forth in Exhibit A of the Operating Agreement.
   e. For accounting and tax purposes, net profits or net losses shall be determined on an annual basis.

2. **TERM AND TERMINATION**
   a. This Agreement shall be effective and binding upon the parties as of the Effective Date.
   b. This Agreement will terminate in the event one of the following occurs:
      i. Written consent of Member
      ii. Member is no longer a member of Company

3. **MISCELLANEOUS**
   a. This Agreement may be amended or modified only by a written agreement signed by all of the parties.
   b. No party shall be deemed to have waived any provision of this Agreement or the exercise of any rights held under this Agreement unless such waiver is made expressly and in writing. Waiver by any party of a breach or violation of any provision of this Agreement

DocuSign Envelope ID: 7391B5E5-7CC7-422F-A822-9EAC9469DA81

shall not constitute a waiver of any other subsequent breach or violation.

c.  No party hereto shall have the right to assign its rights or delegates its duties hereunder without the written consent of the other parties, which consent shall not be unreasonably withheld.

d.  If any provision of this Agreement is held to be invalid, illegal or unenforceable in whole or in part, the remaining provisions shall not be affected and shall continue to be valid, legal and enforceable as though the invalid, illegal or unenforceable parts had not been included in this Agreement.

e.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

f.  The section headings herein are for reference purposes only and shall not otherwise affect the meaning, construction or interpretation of any provision in this Agreement.

g.  The terms of this Agreement shall be governed by and construed in accordance with the laws of the State of California.

h.  Any dispute arising from this Agreement shall be resolved through binding arbitration conducted in accordance with the rules of the American Arbitration Association.

i.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together, shall constitute one and the same document.

j.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together, shall constitute one and the same document.

[Remainder of page intentionally left  blank.]

DocuSign Envelope ID: 7391B5E5-7CC7-423E-A822-92AC94699A81

Case 22-90001-ELM Doc 342 Filed 09/21/22 Entered 09/21/22 14:28:37 Desc
Exhibit Combined Exhibits to Page 88 Page 69 of 72

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.


MEMBER:



BY: _____

NAME: ___Agnes Chin_____

TITLE: _____


[SIGNATURES CONTINUE ON FOLLOWING PAGE]

MANAGER:

URBAN COMMONS LLC, a Delaware
limited liability company

BY: _____
DocuSigned by:

2FE6D2C9084141F...

NAME: Taylor Woods
_____

TITLE: Managing Member

# EXHIBIT E

**Bank of America** 

**Funds Transfer Request Authorization (FTRA)**

### Customer Information

| | |
|---|---|
| **Name:** MICHAEL CHIANG | **Address:** |
| **Phone:** | |

### Account Information

**Account:**
**Account Title:**

**Requestor Name:**

### Wire Information

| | | | |
|---|---|---|---|
| **Wire Type:** | DOMESTIC | **Wire Date:** | 07/10/2020 |
| **Country:** | US | **Wire Amount (USD):** | 300,000.00 |
| **Currency of Recipient Account:** | USD | **Wire Fee:** | 0.00 |
| **Source:** | IN PERSON | | |
| **ID Verification/Type:** | U.S. DRIVER'S LICENSE (WITH OR WITH | | |
| **ID Verification/Type:** | BANK OF AMERICA DEBIT CARD, ATM CAR | | |

### Recipient Information

| | | | |
|---|---|---|---|
| **Recipient Name:** | URBAN COMMONS 6TH AVE SEATTLE LLC | **Bank Name:** | BANK OF AMERICA NATIONAL ASSOCIATION |
| **Account Number Type:** | ACCOUNT NUMBER | **Bank ID:** | |
| **Account Number:** | | **Address:** | 115 W 42ND ST, ONE BRYANT PARK |
| **Address:** | LOS ANGELES | | NEW YORK CITY |
| | CALIFORNIA 90067 US | | NY 10036 US |

**Information about payment:**

**Purpose of Payment:** OTHER          **Additional Phone Advice:**

**Additional Reference Information:**          **Additional Bank Instructions:**

### Customer Approval

I authorize Bank of America to transfer my funds as set forth in the instructions herein (including debiting my account if applicable), and agree that such transfer of funds is subject to this Funds Transfer Agreement (see disclosure pages of this form) and applicable fees. If this is a foreign currency wire transfer, I accept the conversion rate provided by Bank of America at the time the wire is sent. Exchange rates are determined by Bank of America, N.A, in our sole discretion. You may be able to get a better exchange rate if you handle this transaction online instead of in the financial center. Please see the Funds Transfer Agreement for futher information regarding our exchange rates. For a Consumer International wire: We rely on you, the customer, to inform us of the currency of the receiving account (denoted under 'Currency of Recipient Account') so that we may disclose the exchange rate for conversion in the wire process. If you chose to send USD rather than the foreign currency of the receiving account, we will honor your choice, however, we will not be able to provide exchange rate information. Additionally, so that we may provide required disclosures, you must remain in the financial center until we provide you the Remittance Transfer Receipt (RTR). If you leave prior to receiving the RTR, we will cancel the international remittance transfer.

**Customer Signature** _____          **Date of Request** ____/____/____

**IMPORTANT: FOR EACH WIRE Indicate Method of Signature Verification: (must complete one of the below)**

| Not Applicable (check box if no signature verification is required) | Signature Card (check box if signature card was reviewed) | Business Resolution (check box if business resolution was reviewed) | Posted Check# (reference PRO for date guidelines) (complete field below) | Leader Exception Granted (leader must place their initials or signature in box below) |
|---|---|---|---|---|
| | | | Check # | Exception Reason: |

### FOR BANK USE ONLY: Financial Center Information

| | | | |
|---|---|---|---|
| Financial Center Name | SUNSET-OGDEN | Date | July 10, 2020 |
| Company #/Cost Center # | 00318 0000324 | Phone # | 323-762-1675 |
| Initiating Associate Name | KEVORKIAN, MANOUSHAK | Remittance ID # | 9B6AZDFDE |